STEPHENS MEDIA, LLC, A NEVADA LIMITED LIABILITY COMPANY DBA LAS VEGAS REVIEW JOURNAL AND THE ASSOCIATED PRESS, PETITIONERS, v. THE EIGHTH JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA, IN AND FOR THE COUNTY OF CLARK, AND THE HONORABLE JACKIE GLASS, DISTRICT JUDGE, RESPONDENTS, AND THE STATE OF NEVADA, ORENTHAL JAMES SIMPSON, AND CHARLES "CJ" STEWART, REAL PARTIES IN INTEREST.

No. 52399

December 24, 2009                                221 P.3d 1240

*Campbell & Williams* and *Donald J. Campbell* and *J. Colby Williams*, Las Vegas, for Petitioners.

*Catherine Cortez Masto*, Attorney General, and *Jill Carol Davis*, Senior Deputy Attorney General, Carson City, for Respondents.

## OPINION

By the Court, HARDESTY, C.J.:

This petition for extraordinary writ relief challenges the district court's denial of petitioners' motion to intervene in a criminal trial for the limited purpose of accessing juror questionnaires. In reviewing this petition, we must address two issues of first impression. First, we must resolve whether petitioners' motion to intervene in a criminal case to seek access to juror questionnaires is procedurally proper. Second, we are asked to determine whether juror questionnaires used in jury selection are subject to public disclosure. This second inquiry requires an analytical balance between two equally important constitutional rights: the First Amendment right of the public and the press to access criminal proceedings, and the Sixth Amendment right of criminal defendants to receive a fair trial.

After weighing all relevant interests, we conclude that limited intervention by the public or the press is an appropriate procedural mechanism by which the public or press may assert its First Amendment interests in a criminal case. We determine that the district court committed error in denying petitioners' motion to intervene.

We further conclude that juror questionnaires used in jury selection are, like the jury-selection process itself, presumptively subject to public disclosure. The presumption of openness may be overcome, however, only if the district court identifies a countervailing interest to public access and demonstrates, by specific findings, that closure is necessary and narrowly tailored to serve a higher interest. Because we conclude that the district court neither articulated specific findings to show that concerns about juror candor superseded the First Amendment's presumption of open proceedings in jury selection nor considered reasonable alternatives to a complete closure of the questionnaires, we grant petitioners' petition and direct the district court to release all blank and completed juror questionnaires to petitioners.

We recognize that because the underlying criminal trial concluded and the jury rendered a verdict, this remedy might be considered

moot. Nonetheless, we consider this petition because the primary issue—whether juror questionnaires used in jury selection are subject to public disclosure—is of a type that is capable of repetition but evading review.

## FACTUAL AND PROCEDURAL HISTORY

On September 8, 2008, the district court was scheduled to try Orenthal James (O.J.) Simpson and Charles "CJ" Stewart for various criminal offenses. The criminal trial attracted intense press coverage due to Simpson's celebrity status as a former professional athlete and his previous criminal and civil cases involving the murders of his ex-wife, Nicole Simpson, and Ron Goldman.

On September 3, 2008, the district court issued a decorum order to establish the rules and guidelines for the press and other observers who wished to view the trial. Within the decorum order, under "Guidelines for the Media," provision 5 provided, in part:

> No party, counsel, representative of the media, or member of the public shall publish in any way the name or address of any juror or prospective juror, nor a likeness of any juror or prospective juror, in a manner that discloses or may disclose the identity of that person.

Additionally, provision 7 of the order provided, "A sample copy of the jury questionnaire will be provided by the Court after a jury is seated and sworn in to hear the case."

On September 8, 2008, petitioners Stephens Media, LLC, dba Las Vegas Review Journal, and The Associated Press (collectively, the press) filed an emergency application to intervene "for the limited purpose of modifying the district court's Decorum Order as it relates to the issue of juror questionnaires." The press sought access to a copy of the blank juror questionnaire before oral voir dire commenced and access to the completed questionnaires of the jurors and alternates who were ultimately selected to serve as members of the jury. The district court held a brief hearing on the application to intervene but denied the press's application in a written order.

In its order, the district court summarily denied the press's application based on the proposition that Nevada law does not permit intervention in criminal cases. Nevertheless, the district court addressed the press's argument that it had a First Amendment right to access the questionnaires. The court stated that it would not provide access to the blank questionnaires because it was concerned about jury taint and the likelihood that potential jurors would access the questionnaires and tailor their answers to better position themselves onto the jury. Additionally, the court stated that it would not release completed questionnaires "for one simple reason": the court promised the jurors that the questionnaires would be "kept in con-

fidence, under seal" and would be "used solely in the selection of a jury and for no other purpose." After the jury was seated and sworn, the district court permitted the press to access the blank juror questionnaire.

The press filed an emergency petition for writ of prohibition or mandamus challenging the district court's denial of its application to intervene. This court directed an answer from respondent district court judge and determined that an answer from real parties in interest was not necessary to the disposition of this writ. Notably, after the press filed its petition for writ of prohibition or mandamus in this court and after the criminal trial concluded, the district court allowed the press to access a redacted version of the completed juror questionnaires.

## DISCUSSION

A writ of prohibition "serves to stop a district court from carrying on its judicial functions when it is acting outside its jurisdiction." *Sonia F. v. Dist. Ct.*, 125 Nev. 495, 498, 215 P.3d 705, 707 (2009). A writ of mandamus is appropriate " 'to compel the performance of an act which the law requires as a duty resulting from an office or where discretion has been manifestly abused or exercised arbitrarily or capriciously.' " *Hidalgo v. Dist. Ct.*, 124 Nev. 330, 334, 184 P.3d 369, 372 (2008) (quoting *Redeker v. Dist. Ct.*, 122 Nev. 164, 167, 127 P.3d 520, 522 (2006)). An extraordinary writ may be issued only in cases "where there is not a plain, speedy and adequate remedy" at law. NRS 34.330; *see American Home Assurance Co. v. Dist. Ct.*, 122 Nev. 1229, 1234, 147 P.3d 1120, 1124 (2006).

In *American Home Assurance Co.*, we held that there is "no other adequate means [besides an extraordinary writ] by which to challenge the district court's refusal to allow [a petitioner] to intervene." 122 Nev. at 1234, 147 P.3d at 1124. A district court's denial of an application to intervene is not an appealable order. *Aetna Life & Casualty v. Rowan*, 107 Nev. 362, 363, 812 P.2d 350, 350-51 (1991). Thus, a petitioner must seek relief from a district court's denial of a motion to intervene via a petition for extraordinary relief. *Id.* at 363, 812 P.2d at 351. We have also stated that " 'where an important issue of law needs clarification and public policy is served by this court's invocation of its original jurisdiction, our consideration of a petition for extraordinary relief may be justified.' " *Mineral County v. State, Dep't of Conserv.*, 117 Nev. 235, 243, 20 P.3d 800, 805 (2001) (quoting *Business Computer Rentals v. State Treas.*, 114 Nev. 63, 67, 953 P.2d 13, 15 (1998)).

Here, the press did not have an adequate remedy at law to challenge the district court's order denying its application to intervene. Moreover, this petition involves two issues of first impression, both of which implicate significant public policy concerns. Thus, we exercise our discretion to consider the merits of the press's petition and conclude that mandamus, not prohibition, relief is appropriate if we determine that the issues are not rendered moot.

*The issues raised in this writ petition fall within the exception to the mootness doctrine*

At the outset, we note that because the criminal trial has concluded, any relief afforded in this writ petition has no practical implications in the underlying case. Generally, this court will only review cases that present live controversies. *University Sys. v. Nevadans for Sound Gov't*, 120 Nev. 712, 720, 100 P.3d 179, 186 (2004). When a live controversy "become[s] moot by the occurrence of subsequent events," we will not make legal determinations that cannot affect the outcome of the case. *Id.*; *Matter of Guardianship of L.S. & H.S.*, 120 Nev. 157, 161, 87 P.3d 521, 523-24 (2004). Nevertheless, we have recognized that a moot case is justiciable "where an issue is capable of repetition, yet will evade review because of the nature of its timing." *Matter of L.S. & H.S.*, 120 Nev. at 161, 87 P.3d at 524. Thus, we will exercise our discretion to adjudicate a moot case when (1) the contested issue is likely to arise again, and (2) the challenged action is "too short in its duration to be fully litigated prior to its natural expiration." *Id.*

The issues presented here are within the exception to the mootness doctrine. It is exceedingly likely that the media will seek access to juror questionnaires and voir dire proceedings in future high-profile criminal trials. *See ABC, Inc. v. Stewart*, 360 F.3d 90, 97-98 (2d Cir. 2004) (stating that "it is reasonably likely that members of the media will continue to seek access to *voir dire* sessions in high-profile criminal cases"). Moreover, closure of voir dire proceedings and the conclusion of the underlying criminal trial are both likely to expire before the constitutional implications of the closure are properly considered. *See, e.g.*, *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 546-47 (1976); *Stewart*, 360 F.3d at 97-98; *U.S. v. Simone*, 14 F.3d 833, 836 (3d Cir. 1994); *United States v. Peters*, 754 F.2d 753, 758 (7th Cir. 1985). Accordingly, we conclude that the press's petition presents an appropriate circumstance under which we will exercise our original jurisdiction.

*Limited intervention is procedurally proper when the press asserts its First Amendment right to access criminal proceedings*

This court has not previously considered when it is appropriate to grant a motion to intervene in a criminal case. Moreover, neither Nevada's statutes on criminal procedure nor the Federal Rules of Criminal Procedure reference a motion to intervene in a criminal case. *U.S. v. Aref*, 533 F.3d 72, 81 (2d Cir. 2008); *but see* NRCP 24 (outlining intervention of right and permissive intervention in civil actions). However, several federal jurisdictions have held that because the First Amendment implicitly guarantees the right to access criminal trials, motions to intervene are procedurally proper when the public or press seeks to intervene for the limited purpose of accessing a criminal proceeding or court documents. *In re Associated Press*, 162 F.3d 503, 507 (7th Cir. 1998); *United States v. Brooklier*, 685 F.2d 1162, 1168 (9th Cir. 1982); *United States v. Criden*, 675 F.2d 550, 559 (3d Cir. 1982).

Although the United States Constitution[2] does not explicitly state that the press or the public have a right to access criminal trials, the presumption of an open court is firmly rooted in American jurisprudence. *Press-Enterprise Co. v. Superior Court of Cal.* (*Press-Enterprise I*), 464 U.S. 501, 505-08 (1984). The United States Supreme Court has explained that the presumption of open trials is grounded both in history and in logic. *Press-Enterprise Co. v. Superior Court* (*Press-Enterprise II*), 478 U.S. 1, 8-9 (1986). First, criminal trials have historically been open to the public and the press. *Forum Communications Co. v. Paulson*, 752 N.W.2d 177, 181 (N.D. 2008). Indeed, the tradition of openness can be traced back to sixteenth-century English common law, which carried over to colonial America, where public trials and public jury selection existed as common practice before the United States Constitution was ratified. *Press-Enterprise I*, 464 U.S. at 505-08; *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 589 (1980) (Brennan, J., concurring) (emphasizing that the tradition of openness "commands respect in part because the Constitution carries the gloss of history").

Second, the right to access criminal trials is grounded in logic and plays an integral role in the administration of justice. *Press-*

---

[2]Petitioners did not challenge the district court's denial under the Nevada Constitution; however, this court has held that the Nevada Constitution "affords no greater protection to speech activity than does the First Amendment to the United States Constitution." *University Sys. v. Nevadans for Sound Gov't*, 120 Nev. 712, 722, 100 P.3d 179, 187 (2004).

*Enterprise I*, 464 U.S. at 508; *Forum Communications Co.*, 752 N.W.2d at 181. Public access inherently promotes public scrutiny of the judicial process, which enhances both the fairness of criminal proceedings and the public confidence in the criminal justice system. *Id.* Even if an individual does not attend a criminal proceeding, the fact that the public is free to attend enhances his or her confidence in the system by assuring that established procedures are followed. *State ex rel. Beacon Journal v. Bond*, 781 N.E.2d 180, 188 (Ohio 2002). Moreover, public participation derived from public access advances the quality and integrity of the judicial process. *Id.*; *see also Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 606 (1982).

As in this case, we acknowledge that the press often acts as a proxy for the public, advancing the public's understanding and awareness of the criminal justice system. *See Press-Enterprise I*, 464 U.S. at 508-09; *Richmond Newspapers, Inc.*, 448 U.S. at 573, 575-76. Accordingly, we hold that the public and the press have the right to seek limited intervention in a criminal case to advance or argue constitutional claims concerning access to court proceedings.

Here, the press's motion to intervene was denied by the district court, and they now seek writ relief before this court. When considering a writ of mandamus, we generally apply a manifest abuse of discretion standard, *see Hidalgo*, 124 Nev. at 334, 184 P.3d at 372; however, when the issue presented to us requires us to draw a " 'line between speech unconditionally guaranteed and speech which may legitimately be regulated,' " we conclude that de novo review is the proper standard of review. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 285 (1964) (quoting *Speiser v. Randall*, 357 U.S. 513, 525 (1958)). Here, the press's request to access juror questionnaires requires us to draw such a line and, thus, we conduct de novo review to ensure that any restrictions on free speech do not impermissibly intrude "on the field of free expression." *See id.*; *see also U.S. v. Antar*, 38 F.3d 1348, 1357 (3d Cir. 1994); *Simone*, 14 F.3d at 837.

*The First Amendment's guarantee of public access to criminal proceedings extends to juror questionnaires*

In this case, the press argues that the district court's order denying its request to access the blank and completed juror questionnaires in Simpson's and Stewart's criminal trial violated the press's First Amendment right to access criminal proceedings, including oral voir dire proceedings. The press further contends that the district court's generalized fair trial and juror privacy concerns do not outweigh the press's First Amendment rights.

In *Press-Enterprise I*, the United States Supreme Court determined that the right of access to criminal proceedings extended to oral voir dire proceedings and the jury-selection process. 464 U.S. at 505. The Court recognized that since the origins of trial by jury, the selection of jurors has been a public process, vital not just to concerned parties but to the entire criminal justice system. *Id*. Indeed, historical evidence shows that public attendance at jury-selection proceedings was originally compulsory. *Id*. And over time, standards for attendance relaxed and the jury became an impartial trier of fact, promoted in part by the use of peremptory and for-cause challenges asserted in open court. *Id*. at 506. Thus, the historical practice of open jury selection supports the conclusion that the public and press have a right to access voir dire proceedings as an integral part of the criminal trial. *Id*. at 505-06.

Although the Supreme Court has explicitly stated that the presumption of openness applies to voir dire proceedings, *see Press-Enterprise II*, 478 U.S. at 13-14, the Court has not yet addressed whether juror questionnaires prepared in anticipation of oral voir dire are subject to public access. However, several other courts have applied the presumption of openness to preliminary juror questionnaires. *See, e.g., U.S. v. King*, 140 F.3d 76, 82 (2d Cir. 1998); *Forum Communications Co.*, 752 N.W.2d at 185; *Beacon Journal*, 781 N.E.2d at 188.

The Ohio Supreme Court, for example, held that because juror questionnaires merely facilitate and expedite oral voir dire, they are a part of the overall voir dire process and presumed to be accessible as part of the criminal proceeding. *Beacon Journal*, 781 N.E.2d at 188. We agree.

■■■■■ ■■ ■

Juror questionnaires perform a valuable function in the jury-selection process by expediting and assisting a district court's voir dire. Moreover, the use of juror questionnaires does not implicate a separate and distinct proceeding. Rather, use of the questionnaires is merely a part of the overall voir dire process, subject to public access and the same qualified limitations as applied to oral voir dire. *See Forum Communications Co.*, 752 N.W.2d at 185 (concluding that a "written questionnaire serves as an alternative to oral disclosure of the same information in open court and is, therefore, synonymous with, and a part of, voir dire"). Accordingly, we conclude that the First Amendment's qualified right of access extends to juror questionnaires prepared in anticipation of oral voir dire.

*Public access to criminal court proceedings and documents may be limited through application of the Press-Enterprise II balancing test*

■■■■■ ■■

The public right of access to criminal proceedings is not absolute. *Press-Enterprise I*, 464 U.S. at 510. The First Amendment

qualifies the right by creating a presumption of openness that ''may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.'' *Id.*

In determining whether to override the presumption of openness, one fundamental interest we must balance is a criminal defendant's Sixth Amendment right to a fair trial against the press's First Amendment right of access. *Id.* at 510-13; *Press-Enterprise II*, 478 U.S. at 7-10. Significantly, however, the Supreme Court has refused to prioritize the First Amendment and Sixth Amendment guarantees concluding that ''[t]he authors of the Bill of Rights did not undertake to assign priorities . . . ranking one as superior to the other,'' and it is not appropriate to ''undertak[e] what they declined to do.'' *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 561 (1976). To the contrary, other courts, relying on the Supreme Court's statement that the right to a fair trial is ''the most fundamental of all freedoms,'' *Estes v. Texas*, 381 U.S. 532, 540 (1965), have determined that a defendant's Sixth Amendment right takes precedent over the press's First Amendment rights. *See Chicago Council of Lawyers v. Bauer*, 522 F.2d 242, 248 (7th Cir. 1975); *The News-Journal Corp. v. Foxman*, 939 F.2d 1499, 1512 (11th Cir. 1991); *see also State Record Co., Inc. v. State*, 504 S.E.2d 592, 595 n.12 (S.C. 1998). We agree with the rationale in *Nebraska Press Assn.*, and, declining to assign priorities, we instead conclude that the more appropriate approach is to apply a balancing test on a case-by-case basis.

In *Press-Enterprise II*, the Supreme Court articulated a test to apply when balancing the public's and press's First Amendment right to access a criminal proceeding against the defendant's competing Sixth Amendment right to receive a fair trial:

> If the interest asserted is the right of the accused to a fair trial, the preliminary hearing shall be closed only if specific findings are made demonstrating that, first, there is a substantial probability that the defendant's right to a fair trial will be prejudiced by publicity that closure would prevent and, second, reasonable alternatives to closure cannot adequately protect the defendant's fair trial rights.

478 U.S. at 14. *Press-Enterprise II* concerned the right of access to a preliminary hearing, but because the interests at stake during a preliminary hearing and voir dire proceedings are similar—the public's and press's right to access a criminal proceeding and the defendant's right to a fair trial—we now adopt *Press-Enterprise II*'s balancing test to determine when a district court may limit access to juror questionnaires. Applying the analytical framework established in *Press-Enterprise II*, a district court may refuse access to juror

questionnaires only after it "(1) make[s] specific findings, on the record, demonstrating that there is a substantial probability that the defendant would be deprived of a fair trial by the disclosure of the questionnaires and (2) consider[s] whether alternatives to total suppression of the questionnaires would have protected the interest of the accused." *Beacon Journal*, 781 N.E.2d at 191. The district court's order must not be broader than necessary, rather it must be narrowly tailored to protect the defendant's fair trial rights. *Press-Enterprise II*, 478 U.S. at 14. We consider each of the *Press-Enterprise II* factors in turn. Additionally, we consider whether disclosure of redacted completed questionnaires satisfies constitutional standards.

> *The district court failed to make explicit findings that indicated that disclosure of the juror questionnaires would have created a substantial probability of infringement of the defendants' right to a fair trial*

The first prong of the *Press-Enterprise II* balancing test requires a district court to articulate the overriding interest at stake and detail specific findings to support the limitation of access to criminal proceedings and court documents. 478 U.S. at 14. In this case, the district court identified the defendants' fair trial right as the competing interest when it denied the press's request to access the juror questionnaires. Therefore, we must review the district court's findings to determine whether there is evidence demonstrating a "substantial probability" that the defendants would be deprived of a fair trial absent denial of access to the questionnaires. *Id.*

The United States Supreme Court has historically been skeptical of prior restraints on speech based on the risk that pretrial publicity would affect the attitude of potential jurors in such a manner that causes an infringement of the defendant's right to a fair trial. *Nebraska Press Assn.*, 427 U.S. at 568-69. In *Nebraska Press Assn.*, the Court emphasized:

> [T]here was indeed a risk that pretrial news . . . would have some adverse impact on the attitudes of [potential] jurors. But . . . it is not clear that further publicity, unchecked, would so distort the views of potential jurors that 12 could not be found who would . . . fulfill their sworn duty to render a just verdict exclusively on the evidence presented in open court.

*Id.* Likewise, other courts have concluded that even in highly publicized trials, the mere risk of potential jurors' untruthfulness does not demonstrate the required "substantial probability" that the defendant's fair trial rights will be violated. *See ABC, Inc. v. Stewart*, 360 F.3d 90, 101-02 (2d Cir. 2004) (concluding, in part, that absent

controversial issues to be probed in voir dire, the record did not demonstrate that the media's intense presence alone would influence jurors); *U.S. v. Simone*, 14 F.3d 833, 840 (3d Cir. 1994) ("[W]e do not believe that a generic concern about the veracity of testimony constitutes sufficient grounds on which to base closure."); *United States v. Peters*, 754 F.2d 753, 762 (7th Cir. 1985) ("[T]he entire voir dire relies on honest and candid answers to questions of court and counsel. There is no more reason to doubt the integrity of jurors in this regard than in any other area of inquiry."). Indeed, in *Stewart*, the court reasoned that when voir dire proceedings do not concern sensitive or controversial issues, the venireperson's awareness of the press's presence may actually encourage honesty and discourage fabrication. 360 F.3d at 101-02.

Citing *U.S. v. King*, 140 F.3d 76 (2d Cir. 1998), the district court urges this court to deny the press's petition because there was a "substantial probability" that the defendants' rights to a fair trial could be violated. Specifically, the court argues that, like *King*, this case involves a notorious defendant, intense press coverage, and significant concerns related to juror candor. *See King*, 140 F.3d 76. In *King*, the court affirmed the district court's closure because it concluded that the district court had properly considered the *Press-Enterprise II* balancing test. *King*, 140 F.3d at 82. Namely, the district court had (1) made "explicit findings" to support its closure order, (2) considered alternatives to closure, and (3) limited its closure order in duration. *Id.*

Although the facts and issues in this case are similar to those considered in *King*, we conclude that *King* is not dispositive. Notably, unlike the district court in *King*, the district court in this case did not make specific findings to support its denial of access to juror questionnaires and did not discuss alternatives to closure. Instead, the district court expressed a general concern with potential jurors' candidness, particularly because of the extent of press coverage and the possibility that the press's influence could affect the court's ability to impanel a fair and impartial jury.

In every high-profile criminal case, there is a risk that jurors will prejudge the defendant but will be unwilling to admit their prejudgment. However, we agree with other jurisdictions in concluding that the mere risk of juror untruthfulness is not sufficient to support the closure of a criminal proceeding.[3] *See Stewart*, 360 F.3d at 101-02; *Peters*, 754 F.2d at 762; *Beacon Journal*, 781 N.E.2d at 191. The appearance of a fair and impartial jury is essential to the public's confidence in the justice system. Thus, when the district court iden-

---

[3]Where there is a genuine concern about a particular veniremember's candidness, the proper remedy is to remove the juror for cause during the voir dire process. *See Beacon Journal*, 781 N.E.2d at 191.

tifies specific facts that indicate that the possibility of juror taint exists, public scrutiny is essential. *See Simone*, 14 F.3d at 840. The public's participation in these instances not only ensures that suspicions of potential juror misconduct are publicized, but ideally, public pressure will discourage those who intend to abuse the system. *See King*, 140 F.3d at 84-85 (Cabranes, J., dissenting) ("[I]t is precisely in those cases involving controversial or notorious defendants that the public—and its media proxies—are likely to take an interest . . . . It would be perverse to enshrine a constitutional right of public access . . . and then to enforce that right only [when] the public has no interest.").

We determine that the district court's concern that potential jurors would preview the questionnaires and formulate their answers to better position themselves on the jury is based on unsupported conjecture. We recognize that as a result of Simpson's celebrity status and previous murder trial, there was significant press coverage and public interest in the underlying criminal case. However, the district court failed to articulate specific findings that would defeat the First Amendment's presumption of openness. Although juror candidness is a valid, considerable interest, we decline to adopt a policy of suspicion and mistrust in this case by determining that 12 citizens could not be found among a large pool of potential jurors who would faithfully perform their jury service. *See Nebraska Press Assn.*, 427 U.S. at 568-69.

The district court also summarily denied the press's request to access the completed questionnaires of the jurors who were actually impaneled "for one simple reason": the court promised the jurors that the questionnaires would be "kept in confidence, under seal" and would be "used solely in the selection of a jury and for no other purpose." After the press filed its petition for extraordinary relief, and after the criminal trial concluded, the district court determined that it would allow access to redacted versions of the impaneled jurors' completed questionnaires.

We conclude that the district court erred in denying the press's request for access to the completed juror questionnaires. The court's blanket promise of confidentiality does not satisfy the *Press-Enterprise II* requirement that a court articulate specific findings to support its decision. We stress that a "naked assertion . . . without any specific finding of fact" does not justify closure of the voir dire proceedings. *In re Memphis Pub. Co.*, 887 F.2d 646, 648-49 (6th Cir. 1989); *see also Simone*, 14 F.3d at 840-41.

In light of the historic tradition of open and oral voir dire proceedings, a district court's promise to maintain confidentiality does not supersede the public's and the press's First Amendment right to

access criminal proceedings. Because the district court's blanket promise to ensure juror confidentiality was not based on specific findings, it was not sufficient to support its denial of access to completed juror questionnaires. *See Beacon Journal*, 781 N.E.2d at 190 ("Constitutional rights are not superseded by the mere promise of a trial judge to act contrary to those rights."). Furthermore, although here the district court subsequently released redacted versions of the completed questionnaires, we conclude that this retroactive release is not sufficient to cure the district court's failure to satisfy the *Press-Enterprise II* requirement that it make specific findings to support its denial of access to the juror questionnaires. *See U.S. v. Antar*, 38 F.3d 1348, 1351 (3d Cir. 1994); *Simone*, 14 F.3d at 842.

> ### *The district court did not consider alternative options prior to denying access to the juror questionnaires*

For the purpose of providing guidance to the district courts in future criminal cases, we assume arguendo that the district court did articulate findings that were sufficient to warrant suppression of both the blank and completed juror questionnaires. Thus, assuming the first *Press-Enterprise II* prong is satisfied, next we must consider the second prong of the *Press-Enterprise II* balancing test, that is, whether the district court considered alternative methods of protecting the defendants' fair trial rights before ordering complete suppression of the questionnaires. *Press-Enterprise Co. v. Superior Court (Press-Enterprise II)*, 478 U.S. 1, 14 (1986). Because the balancing test requires the district court to consider whether reasonable alternatives to closure would sufficiently address countervailing interests, we stress that the circumstances of each case require a different remedy. *See Copley Press v. San Diego County*, 278 Cal. Rptr. 443, 449 (Ct. App. 1991) ("[A]n individualized approach rather than a blanket one" is better suited to consider countervailing interest while simultaneously "preserv[ing] the constitutional values of openness.").

> ### *Analysis when juror privacy is the countervailing interest*

When the district court identifies juror privacy as the countervailing interest, such as when questions asked during voir dire are deeply sensitive and personal in nature, a court must balance the privacy interests of prospective jurors with the historical presumption of openness. *Press-Enterprise Co. v. Superior Court of Cal. (Press-Enterprise I)*, 464 U.S. 501, 511-12 (1984); *King*, 140 F.3d at 81.

Because, in this case, the district court did not identify juror privacy as the countervailing interest conflicting with the First Amendment, we only address this issue in order to provide guidance to the district courts in future matters.

▬▬▬

In cases where juror privacy is a concern and when considering alternatives under the second prong of *Press-Enterprise II*, we instruct district courts to follow the procedure set forth in *Press-Enterprise I*: after disclosure to prospective jurors of the "general nature of sensitive questions" being asked during voir dire, the district court should inform those prospective jurors that if they "believ[e] public questioning will prove damaging because of embarrassment, [they] may properly request an opportunity to present the problem to the judge *in camera* but with counsel present and on the record." *Press-Enterprise I*, 464 U.S. at 512; *see also Beacon Journal*, 781 N.E.2d at 189-90.

By requiring jurors to make an affirmative request, we determine that the procedure would effectively reduce the risk of unnecessary closure of the voir dire proceedings, as the trial judge could consider whether there is a factual basis for the juror's privacy right. *Press-Enterprise I*, 464 U.S. at 512. And to protect and ensure the value of openness, the district court may release the transcript of the proceedings when concerns related to the juror's privacy have lessened. *See Simone*, 14 F.3d at 842 (recognizing, however, that the court must nonetheless strictly analyze the standards for closure, as the subsequent release of in camera transcripts is not the equivalent of an open proceeding).

### *Analysis when a defendant's right to a fair trial is the countervailing interest*

▬▬▬

In a high-profile case that presents the risk of harassment or jury influence by the media, juror candor may be stifled, inhibiting a defendant's right to a fair and impartial jury. *See King*, 140 F.3d at 82. However, we caution district courts from hastily closing voir dire proceedings because of the possibility that the presence of the press would inhibit juror candor. In protecting a defendant's fair trial rights, the district court must consider reasonable alternatives to complete closure of the voir dire proceedings, which, as we previously stated, includes juror questionnaires. *See, e.g., Forum Communications Co. v. Paulson*, 752 N.W.2d 177, 186 (N.D. 2008); *Stewart*, 360 F.3d at 105; *King*, 140 F.3d at 82.

Here, the district court expressed concern that a lack of juror candor may violate defendants' right to a fair trial; however, the court did not consider reasonable alternatives before denying the press's

request for access to both the blank and completed questionnaires. Accordingly, we conclude that the district court's order was not narrowly tailored.

### Blank questionnaires

We recognize at least two available alternatives to complete suppression of the blank questionnaires. First, we determine that partial closure—limiting access to portions of the questionnaires based on articulated and systematic findings—could have sufficiently ensured juror truthfulness. Because a majority of the questions concerned customary background information and the jurors' familiarity with Simpson, we see no benefit associated with the complete suppression of the blank juror questionnaire. Second, although the court expressed concerns that if the questionnaire was accessible, potential jurors would craft their answers to better place themselves on the jury panel, we conclude that removing a suspicious juror for cause is a reasonable and practical alternative to complete closure. *See Beacon Journal*, 781 N.E.2d at 191.

### Completed questionnaires

We conclude that the district court's decision to completely suppress the potential jurors' completed questionnaires was not narrowly tailored to ensure juror candor. The district court instructed potential jurors that the completed questionnaires would be "kept in confidence, under seal" and would be "used solely in the selection of a jury and for no other purpose." However, if juror privacy was the district court's principal concern, the proper alternative would have been to advise the jury pool that although the questionnaires would not be held in strict confidence, individuals may request in camera questioning if they believed that answering particular questions may lead to damaging embarrassment or harassment. *See Press-Enterprise I*, 464 U.S. at 512. Thus, we conclude that the district court's failure to follow the *Press-Enterprise I* in camera procedure, in addition to the court's failure to consider any other reasonable alternatives to complete suppression, constituted a manifest abuse of discretion.

### Whether redacted versions of completed juror questionnaires satisfy constitutional standards

We emphasize that the district court's subsequent release of redacted versions of the completed questionnaires upon the conclusion of the trial did not cure the district court's failure to consider reasonable alternatives before it ordered complete closure. *See Antar*, 38 F.3d at 1351. Nonetheless, in order to guide the district

courts in future cases, we consider in general whether and when redactions of completed juror questionnaires conform to constitutional standards.

First, we note that when closure of a voir dire proceeding is properly imposed, a redacted version of the proceedings is the "constitutionally preferable method" because it advances juror anonymity while concurrently allowing the public and press to access jurors' substantive responses. *Press-Enterprise I*, 464 U.S. at 520 (Marshall, J., concurring). However, we hold that granting partial access in the form of redacted questionnaires similarly requires specific findings demonstrating the justification for restricted access, and the criteria and procedure on which the court relies when redacting the questionnaires. *See, e.g., In re Baltimore Sun Co.*, 841 F.2d 74, 76 (4th Cir. 1988) (recognizing the great risk of the public losing confidence in the justice system if a criminal defendant is tried by an anonymous jury); *In re Juror Names*, 592 N.W.2d 798, 809 (Mich. Ct. App. 1999) (holding that a court cannot deny press access to jurors' background information without first determining whether concerns regarding juror privacy and safety are "legitimate and reasonable"); *Beacon Journal*, 781 N.E.2d at 194 (holding that the suppression of juror names and addresses requires particularized findings).

Second, a district court's determination to limit access through redactions should be limited in time and in scope. Because juror harassment or improper influence is significantly reduced after a verdict is rendered, a court must articulate specific findings if it intends to maintain confidentiality after the verdict is rendered. *See In re Globe Newspaper Co.*, 920 F.2d 88, 91 (1st Cir. 1990) ("No doubt stronger reasons to withhold juror names and addresses will often exist *during* trial than *after* a verdict is rendered."); *see also U.S. v. Wecht*, 537 F.3d 222, 239 (3d Cir. 2008) ("[A] presumption of openness exists at the latest at the time of the swearing and empanelment of the jury.").

In this case, after the jury rendered its verdict in the underlying criminal trial, the district court modified its order and allowed the press access to redacted versions of the completed questionnaires.[4] Because of the extent of the press coverage and the possibility of

---

[4]The court redacted nine questions. Numbered as they were in the questionnaire, they are as follows:

    6. Where were you born and raised?

    7. In what city and neighborhood or area do you live? (Do not list street address.)

juror harassment or juror influence, releasing redacted versions of the completed questionnaires within a reasonable amount of time would have constituted a sound alternative to complete closure. However, the limited redactions in this case were not based on articulated findings or discernible criteria. In its answer, the district court argues that its redactions were "centered upon protecting the location of the jurors" and "identifiers that in this modern day and age permit a juror to be physically located." After reviewing the redacted questions and the district court's ruling below, it is unclear what criteria the district court used to determine the questions to be redacted.

More importantly, however, the district court redacted the questionnaires after the jury had rendered its verdict. By this point, any concerns related to juror harassment or juror influence had all but dissipated. Therefore, even if the court was legitimately concerned with the jurors' privacy or safety, it neither articulated clear criteria for determining which questions to redact, nor did it justify its decision to redact the questionnaires after the jury had rendered its verdict. *See Forum Communications Co. v. Paulson,* 752 N.W.2d 177, 185 (N.D. 2008) (concluding that the district court's decision to seal juror names after the jury was discharged was insufficient because the court did not articulate specific findings as to why closure was necessary after the trial ended).

Thus, the subsequent release of the redacted juror questionnaires did not cure the district court's original order to deny the press's request for access. However, even if the court had initially considered redaction as an alternative, we nonetheless conclude that the court's

---

8. Which of the following best describes where you live? (Own home, Own apartment/condo, Rental house, Rental apartment/condo, Live with friends or relatives, Other (please specify)[.]

10. What are/were your parents and/or step-parents' occupations? (If retired or deceased, what did they do?)

11. Do you have any children or stepchildren? If so, please state: (Sex[,] Age[,] Child living with you?[,] Level of Education[,] Occupation)[.]

15. If you are now employed: (Name and location of employer, Job title and duties[.])

16. If you (a) have been with your current employer less than ten years or (b) if you checked unemployed, retired, disabled or student, please answer the following questions about your last job: How long were you at this job? Termination date[.] Name and location of employer[.] Job title and duties[.]

17. In addition to the jobs listed in questions 14 and 15, please list other jobs you have had or work you have done as an adult. (Start with your first job and work forward.)

18. Are you currently an employee, vendor or contractor of the United States government, state government or local government?

ultimate redaction was not reasonable based on the district court's failure to make specific findings or provide discernible criteria. Thus, the press was entitled to all requested juror questionnaires in an unredacted form.

Accordingly, we grant the petition. The clerk of this court shall issue a writ of mandamus instructing the district court to release the blank juror questionnaires and all unredacted completed juror questionnaires to petitioners.

PARRAGUIRRE, DOUGLAS, CHERRY, SAITTA, and GIBBONS, JJ., concur.