*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 15-CF-663

JONATHAN BLADES, APPELLANT,

v.

UNITED STATES, APPELLEE.

FILED 1/23/2019
District of Columbia
Court of Appeals
Julio Castillo
Clerk of Court

Appeal from the Superior Court
of the District of Columbia
(CF1-2153-14)

(Hon. Michael Ryan, Trial Judge)

(Argued October 17, 2017      Decided January 23, 2019)

*Fleming Terrell*, Public Defender Service, with whom *Samia Fam* and *Jaclyn S. Frankfurt*, Public Defender Service, were on the brief, for appellant.

*Nicholas P. Coleman*, Assistant United States Attorney, with whom *Channing D. Phillips*, United States Attorney at the time, and *Elizabeth Trosman*, *Elizabeth H. Danello*, *Scott Sroka*, and *Christopher Macchiaroli*, Assistant United States Attorneys, were on the brief, for appellee.

Before THOMPSON and BECKWITH, *Associate Judges*, and FARRELL, *Senior Judge*.

Opinion of the court by *Associate Judge* THOMPSON.

Opinion by *Senior Judge* FARRELL, concurring in part and concurring in the result, at page 35.

Dissenting opinion by *Associate Judge* BECKWITH at page 38.

THOMPSON, *Associate Judge*: Following a four-day jury trial, appellant was convicted of assault with intent to kill while armed ("AWIKWA") (firearm), two counts of possession of a firearm during a crime of violence ("PFCV"), aggravated assault while armed ("AAWA") (firearm), possession of an unregistered firearm ("UF") and unlawful possession of ammunition ("UA"). Appellant asks this court to reverse all of his convictions, contending that the trial court reversibly erred by employing a husher during the voir dire of prospective jurors, in admitting a photo array containing mugshots even though identity of the shooter was not an issue, in not intervening when the prosecutor made certain remarks during the government's closing argument, and in giving a jury instruction on provocation. For the reasons that follow, we affirm.

**I.**

The charges against appellant were based on an incident that occurred in the early morning hours of February 2, 2014, outside of Look Lounge, near the intersection of 20th and K Street, N.W. Johnny Campbell testified that he was leaving the Look Lounge nightclub around 2:40 a.m. on that morning with his friends Jeremy Paige and "Rob" and was turning right to walk to his car when he ran into Areka Mitchell, with whom he had gone to high school. Campbell greeted

Mitchell, and Mitchell introduced appellant to Campbell as her fiancé. Campbell testified that appellant then said in an "angry" voice, "Who the fuck are you?" and "something like" "What are you all, like school buddies or study buddies?" Campbell and appellant were "in each other's face," and appellant then struck Campbell in the face.

Campbell testified that he hit appellant back and they began fighting.[1] Appellant was on the ground when Campbell "felt a blow to [his] head," which "stunned [him]," and then felt a second blow to his head, which "shook [him] up" and "made [him] get up off of [appellant]." Campbell then heard appellant say either "I'm going to get my shit" or "[w]here's my shit," words that Campbell understood to mean that appellant was "going to get [his] gun." Campbell also heard Mitchell say, "[h]e's getting ready to bust your ass," which Campbell understood to mean that he was "about to get shot." Campbell testified that he ran diagonally across 20th Street, eventually turning left onto L Street. As he was running across 20th Street, he heard gun shots, causing him to "r[u]n even faster," and he saw "[appellant] with [his] car door open . . . [and] fire coming from the gun" in appellant's hand. At some point, Campbell became aware of "a hole in

---

[1] Appellant testified that before the fighting began, Rob left "to get the car for another buddy that was inside" and thus was not on the scene.

[his] back" and that he "couldn't lift [his] arm up." He eventually ran into a nearby Exxon station where an ambulance was called and took him to a hospital.[2]

Paige, Campbell's friend since childhood, testified that he and Campbell were walking to Campbell's car when appellant called out to Campbell and got "in [Campbell's] face." Paige testified that appellant pushed Campbell in the chest, that Campbell responded by hitting appellant in the face, and that the two men "got to grappling with each other."[3] Appellant then fell over a planter, and Campbell "punch[ed] [appellant] against [appellant's] car." That was when Mitchell began hitting Campbell in the back of his head with her high-heeled shoe. After this, appellant and Campbell both got up and the fight continued in the middle of 20th Street, at which time Paige was "trying to guide [Mitchell] from hitting [Campbell] in the back of the head." Paige testified that Campbell then "caught [appellant] with two or three good shots," and appellant fell to the ground. Campbell went directly "across the street from [appellant's] car," and Mitchell "followed [Campbell], screaming." Paige "thought the fight was over," but then saw appellant, who had a gun in his hand, "reach[] in[to] the back seat" of his car

---

[2] Campbell also testified that shortly after the shooting ceased, he saw appellant's car coming at him and was hit and "rolled off the car." Appellant was found not guilty of the charges related to this allegation.

[3] Paige agreed that Campbell threw the first punch.

(which the testimony indicated was parked on 20th Street between K and L Street), "load[] the magazine into the gun," and "start[] shooting." Paige testified that "it seemed like [appellant shot] probably seven to eight bullets" but that "[i]t could be more." Paige testified that no one was physically hitting appellant at the point when appellant started shooting and that there was no one near appellant who was a physical threat to appellant at that time. Paige denied hitting, punching, or kicking appellant or otherwise participating in the fight and testified that none of the friends who had been with him and Campbell at the club was participating or even standing around during the fight.

Metropolitan Police Department ("MPD") Officer James Burgess, who was with the MPD Crime Scene Investigations Division, collected evidence from the scene of the shooting, including nine cartridge casings, one bullet fragment, and two bullets. The cartridge casings were all found on 20th Street. Officer Burgess testified that one of the bullets was found inside a newspaper box on L Street, near the corner of 20th and L Street, and that the other bullet was found a little further west on L Street.

Daniel Barrett, a firearms and toolmark examiner with the Department of Forensic Science, testified that all nine cartridge casings were the same caliber and

from the same manufacturer and had the same caliber and manufacturer as casings recovered from inside a semiautomatic firearm found in appellant's residence. Mr. Barrett further testified that "shell casing[s] . . . eject to [the shooter's] right side" and "bounce when [they] hit[] the cement." Looking at Government Exhibit 40, which depicted where the shell casings were found on 20th Street, Mr. Barrett testified that the locations were "indicative of [the shooter] being off to the left and walking in a straight line," up 20th Street toward L Street.

Dr. Bruce Abell, the trauma surgeon who attended to Campbell on the morning of the incident, testified that Campbell presented with abrasions to his lip and face, swelling that was "consistent with someone being punched," and "a small laceration" on his scalp, which was "consistent with hitting something or being hit by something." Dr. Abell further testified that a bullet pierced and then left Campbell's body and that there was a wound in his left shoulder and on his back. Dr. Abell could not tell which of the wounds was an entrance wound and which was an exit wound. He opined, however, that the wounds were consistent with Campbell's "facing away from the shooter, but to an angle" and were "not consistent with [Campbell's] facing a shooter." Dr. Abell also noted that "with short range gunshots, . . . you can actually see some changes on the skin at the entrance wound, . . . [i.e.,] stippling," which Dr. Abell did not see on Campbell.

Dr. William Bruchey, an expert in firearms examination, ballistics, and crime scene reconstruction, testified in the defense's case that there is a "randomness to the shell casing pattern" of a semiautomatic pistol. Based on where the shell casings were found on 20th Street, Dr. Bruchey opined that the shooter was "relatively stationary" rather than walking. Asked on cross-examination how he accounted for the bullet "recovered further left on L Street," Dr. Bruchey said that a newsstand when hit by a bullet "can make [the bullet] take a left turn."

Appellant testified that after leaving Look Lounge on the early morning in question, he went to retrieve his car, with the intent of pulling it in front of the club to pick up his fiancée, Mitchell. The valet parking obstructed appellant from doing this, so he turned right onto 20th Street and found an open parking spot immediately upon turning. After parking, he reached into his glove compartment and retrieved his loaded gun and put it on his hip "for protection" because he had been shot about two months previously after leaving a club. The bullet from that shooting had gone through his arm and into his chest and remained lodged there at the time of the trial.

Appellant testified that he went to the front of the club and found Mitchell and was walking back to his car with her when they encountered a group of three guys who "were being loud[and] belligerent." One was Campbell, and appellant testified that Campbell "grabbed [Mitchell] by the hips and pulled her close" and, when Mitchell "pushed his hand off her," "kept on approaching, [and being] aggressive toward her." Appellant then grabbed Campbell's shoulders, and turned him around, and the two of them "had verbal words." During this time, appellant testified, Mitchell was pulling appellant away "because she . . . didn't want the argument to escalate" and walking towards the car. When appellant reached the driver-side door but before he could get into the car, Campbell "ran up" and punched him in the face. Campbell and appellant started fighting, and Paige "ran over and . . . started . . . swinging at [appellant]," "hitting [him] on top of [his] head," and it became "like a moving brawl." Appellant testified that he heard Rob say "move back, let me stab him." Appellant then "pushed off as hard as [he] could" from the two others and reached for his gun and "pulled the trigger[] as fast as [he] could," afraid that one of the men would try to take the gun from him. Appellant testified that he was concerned about "what would happen to . . . [the] bullet in [his] chest" if he was hit the wrong way, that his intent was "to just get them off of me" and "stop them from jumping me," and that it was not his intent to kill Campbell. Appellant told the jury that he was "disoriented from getting hit" in

the head and could not "see straight" because he had blood in his face and eyes, but stopped shooting after he "started to come to and started to see clearly" and noticed that "the threat wasn't there" and the other men were not in front of him. Appellant acknowledged that he fired nine shots but said that he did not think he hit anyone and therefore just returned home after the shooting.

The jury received a verdict form that instructed jurors to consider whether appellant was guilty of the lesser-included offense of assault with a dangerous weapon (firearm) if they acquitted appellant of the AWIKWA (firearm) charge. The jury found appellant not guilty of AWIKWA (automobile), assault with a dangerous weapon (automobile), and AAWA (automobile). This appeal followed.

**II.**

We turn first to the issue appellant raised for the first time in a supplemental brief, which this court granted him leave to file. In seeking permission from the court to file the supplemental brief, counsel explained that it had come to her attention that she "failed to raise a preserved issue of constitutional importance in [a]ppellant's opening brief: the denial of [appellant's] right to a public trial during jury selection," an issue that counsel said was "essential to raise . . . on appeal in

order to provide effective assistance to [appellant]." The government did not oppose appellant's motion to file a supplemental brief, but asserts in a footnote to its supplemental opposition brief that the court could treat the claim raised in the supplemental brief as waived, as this court typically does with arguments raised for the first time in a reply brief or during oral argument. Given counsel's commendable candor and the importance of effective assistance of counsel, we elect to consider the "public-trial" issue raised in the supplemental brief.

The record shows that the court posed *voir dire* questions to prospective jurors in open court and, thereafter, questioned individual jurors about their responses at the bench, with the husher turned on to prevent everyone except the court, the attorneys, appellant, and the court reporter from hearing the exchanges that followed.[4] As the court described the procedure, it entailed "doing the examination up at the bench and leaving seats in the back of the courtroom for the public and authorizing access to the proceedings as appropriate or where requests are made." Appellant's contention in his supplemental brief is that the trial court violated his constitutional right to a public trial by conducting individual-juror *voir*

---

[4] "A 'husher' is a mechanical, white noise device intended to foster the confidentiality of conversations at the bench (in this case, to protect the privacy of prospective jurors)." *Barrows v. United States*, 15 A.3d 673, 681 n.13 (D.C. 2011).

*dire* at the bench with the husher turned on, an arrangement that prevented the public from hearing the exchanges that occurred. Appellant asserts that the trial court failed to make the findings required by *Waller v. Georgia*, 467 U.S. 39, 48 (1984) ("[T]he party seeking to close the [courtroom] must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.").[5] Appellant asserts that in the absence of such findings, use of the husher to preclude the public from hearing the *voir dire* exchanges at the bench was structural error, entitling him to reversal of his convictions without a required showing of prejudice or harm (and, accordingly, appellant has not attempted to show prejudice from use of the husher).

In raising the public-trial issue in the trial court, appellant asserted that there was no "compelling interest to exclude the public" and that conducting the jury selection process "with the husher on albeit with . . . seats in the back of the courtroom open . . . to people to sit in on a husher," i.e., "where the matters can be

---

[5] *But see Woods v. Kuhlmann*, 977 F.2d 74, 76 (2d Cir. 1992) (joining the Ninth, Tenth and Eleventh Circuits in concluding that "when a trial judge orders a partial, as opposed to a total, closure of a court proceeding at the request of one party, a 'substantial reason' rather than [an] 'overriding interest' will justify the closure").

seen but not heard," was "not consistent with what the Constitution envisioned as being an open trial." The trial judge acknowledged that the public and the press "have a right to participate" and a "right to get every syllable of th[e] conversations" that occur at the bench during *voir dire*, a right the court reasoned, however, "can get effectuated in different ways." In denying appellant's request to proceed without the husher, the trial judge cited his concern about "the candor of prospective jurors," which he said was "[b]ased on 20 years of being a trial lawyer and more than 10 years of being a [j]udge." The judge explained that it was his "experience and belief that [potential jurors] are less forthcoming in response especially to sensitive questions when they don't have, at least, the cover of the husher and being up at the bench."

The Sixth Amendment to the United States Constitution provides in pertinent part that "[i]n all criminal prosecutions, the accused shall enjoy the right to a . . . public trial . . . ." U.S. Const. amend. VI. The Supreme Court has recognized that the guarantee of a public trial extends to the *voir dire* examination of potential jurors. *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 504-10, (1984) (considering the issue under the First Amendment); *Presley v. Georgia*, 558 U.S. 209, 213 (2010) ("[T]here is no legitimate reason, at least in the context of juror selection proceedings, to give one who asserts a First Amendment privilege

greater rights to insist on public proceedings than the accused has [under the Sixth Amendment].").  As this court has observed, "it is only under the most exceptional circumstances that limited portions of a criminal trial may be closed even partially to the public."  *Kleinbart v. United States*, 388 A.2d 878, 883 (D.C. 1978).  We held in *Kleinbart* that "[w]here the trial court has improperly excluded the public or a portion thereof from the courtroom during a criminal trial, and the accused has made timely objection to such exclusion, prejudice will be presumed without placing the burden upon the accused to show actual harm to justify reversal."  *Id.* at 882 (reversing Kleinbart's conviction because, during the testimony phase of his trial, "the courtroom was locked upon order of the trial court," which thereby "closed [the] trial to all the public for a portion of at least one day" "*for no articulated reason*," *id.* at 879, 881, 883 (emphasis in the original)).

The government argues that appellant's claim that he is entitled to reversal of his convictions without any showing of actual harm is foreclosed by this court's holding in *Copeland v. United States*, 111 A.3d 627 (D.C. 2015):  "We hold that the long-standing practice in this jurisdiction of conducting individual *voir dire* at the bench, within the view but outside the hearing of the public, is not a structural error."  *Id.* at 634-35.  Appellant discounts that explicit "hold[ing]," asserting that it was not "needed to resolve Copeland's ineffective assistance [of counsel] claim

[that was premised on counsel's failure to inform Copeland of his right to be present at the bench during the *voir dire* of individual jurors]" and thus was *dictum*, and arguing in addition that the "hold[ing]" announced in *Copeland* is inconsistent with this court's holding in *In re Access to Jury Questionnaires*, 37 A.3d 879 (D.C. 2012).

Even assuming *arguendo* that the pertinent "hold[ing]" in *Copeland* was *dictum*, we reach the same conclusion here, for the reasons the *Copeland* court articulated and others. As we said in *Copeland*, "[w]hen questioning occurs at the bench, the public can still observe the proceedings," thus "further[ing] the values that the public trial right is designed to protect," and can "hear the general questions posed to the jury panel." 111 A.3d at 634 (internal quotation marks omitted). We emphasized that when the husher is used during individual *voir dire* questioning at the bench, "[t]he courtroom [i]s not closed, no one [i]s excluded from observing *voir dire*, and a transcript of the proceeding is available." *Id.* at 633. We explained that the husher procedure is "designed, in part, to protect a juror's privacy and to encourage potential jurors to be forthright when they might otherwise be reluctant to discuss personal experiences or private matters" and also

"to prevent a potential juror's answers to *voir dire* questions from prejudicing other members of the venire." *Id.* at 634.[6]

In general, courts have found there to be full or partial courtroom closures only where some or all members of the public are precluded from perceiving contemporaneously what is transpiring in the courtroom, because they can neither see nor hear what is going on. For example, in *Presley*, 558 U.S. 209, the Court held that the defendant's right to a public trial was violated when the trial court excluded the public, including the defendant's uncle, from the courtroom during *voir dire* of prospective jurors, to prevent jurors from overhearing some inadvertent comment or conversation. *Id.* at 213. In *Cable News Network, Inc. v. United States*, 824 F.2d 1046 (D.C. Cir. 1987), the D.C. Circuit summarily reversed the district court's determination "that *voir dire* examinations would be

---

[6] We also said in *Copeland* that we could find "no authority . . . holding that the practice of conducting a limited amount of individual *voir dire* at the bench with a 'husher' on violates a defendant's right to a public trial." 111 A.3d at 633. In fact, there is at least one opinion that holds that use of a white noise device during *voir dire* violates the First Amendment in the absence of findings of fact supporting that restriction on the right of access. *See In re Petitions of Memphis Pub. Co.*, 887 F.2d 646 (6th Cir. 1989); *but see id.* at 649 (Norris, J., dissenting) ("I do not believe that the district court's limited use of a device which emitted static and its withholding of the transcript of the voir dire until the jury was impaneled violated any rights secured by the United States Constitution" and "I am not convinced that the procedure utilized was tantamount to closing the voir dire to the public.").

conducted *in camera* save for any prospective jurors who elected to be questioned in open court." *Id.* at 1047. The D.C. Circuit did not state precisely what it meant by "*in camera*," but Black's Law Dictionary defines "*in camera*" as meaning either "[i]n the judge's private chambers" or "[i]n the courtroom with all spectators excluded." (10th ed., West 2009 at 878). Thus, we read *Cable News* as holding that the public-trial right is violated when individual-juror *voir dire* is held in the judge's chambers or elsewhere in a place from which the public is excluded. Similarly, in *ABC, Inc. v. Stewart*, 360 F.3d 90, 95 (2d Cir. 2004), the court found an erroneous closure of the *voir dire* proceedings where examinations of prospective jurors were conducted in the judge's robing room. Decisions of this court rendered upon plain-error review have reached a similar result. *See (Antonio) Williams v. United States*, 51 A.3d 1273, 1283 (D.C. 2012) (finding obvious error where the *voir dire* of individual jurors was moved to a jury room, from which spectators were excluded, to accommodate the visually impaired prosecutor); *see also Barrows*, 15 A.3d at 679 (finding obvious error where the trial court excluded members of the public from the courtroom during the time it took to conduct *voir dire*, in order to accommodate the large number of potential jurors in the venire).

By contrast, where proceedings are conducted in the open courtroom but with some members of the public having an obstructed view, courts have generally concluded that the process is an alternative to closure rather than a closure subject to the requirements of *Waller*. *See, e.g.*, *Rodriguez v. Miller*, 537 F.3d 102, 103-10 (2d Cir. 2007) (holding, upon reconsideration of an earlier ruling at Supreme Court direction, that the trial court's requirement that defendant's family members sit behind a screen to shield a testifying undercover police officer from their view or otherwise be excluded from the courtroom during the officer's testimony did not violate clearly established federal law and was at least arguably a "reasonable alternative to closure" of the courtroom to the family members, rather than a partial closure);[7] *Pearson v. James*, 105 F.3d 828, 830 (2d Cir. 1997) (characterizing the placing of a screen between spectators and a testifying undercover officer as an "alternative[] to closure"); *United States v. Lucas*, 932 F.2d 1210, 1217 (8th Cir. 1991) (use of screen to permit spectators to hear but not see detective's testimony

---

[7] As we observed in *Kleinbart*, "[t]he right to a public trial has never been definitively construed by the Supreme Court." 388 A.2d at 881. The Supreme Court's remand that prefaced the ruling in *Rodriguez*, *see* 537 F.3d at 103, suggests that the Supreme Court might agree that use of a device that partially but not fully obstructs the public's ability to perceive trial proceedings, accompanied by reasonable access to transcripts, does not amount to a "closure" for purposes of the Sixth Amendment public-trial right. *See Miller v. Rodriguez*, 549 U.S. 1163 (2007) (remanding the "screen" issue to the Second Circuit in light of *Carey v. Musladin*, 549 U.S. 70 (2006) (pertaining to the meaning of "clearly established federal law")).

was in lieu of closure of the courtroom and did not violate the defendant's public-trial right); *State v. Schultzen*, 522 N.W.2d 833, 836 (Iowa 1994) (public trial right not violated by reasonable alternative to closure, or "quasi-closure," that entailed having three spectators (members of defendant's family) seated behind blackboards during a portion of the victim's testimony so that the line of view between the victim and the family members was obstructed).[8]

The foregoing case law supports a conclusion that the husher procedure employed in this case — an instance of "the long-standing practice in this jurisdiction of conducting individual *voir dire* at the bench, within the view but outside the hearing of the public," *Copeland*, 111 A.3d at 634-35 — does not amount to a closure or partial closure of the courtroom, but is more appropriately viewed as an alternative to closure. We think that even more so than the obstructed-view procedures discussed in the foregoing cases, use of a husher during the conduct of individual *voir dire* at the bench, along with access within a

---

[8] *See also State v. Drummond*, 854 N.E.2d 1038, 1080 (Ohio 2006) (Moyer, C.J., dissenting) (referring to option of "placing a screen between the witnesses and the spectators to conceal the witnesses from public view" as an alternative to closing the courtroom).

reasonable time to transcripts of the individual prospective-juror examinations,[9] is a reasonable alternative to closure of the courtroom that enables the public to see the court proceedings, including facial expressions and body language of at least some of the participants at the bench, and thus honors the defendant's right to a public trial. We note also that use of the husher avoids the partial closure of the courtroom entailed in the process that appellant's trial counsel told the court had recently been utilized by another judge and that counsel appeared to endorse for use in this case: allowing the public to be in the courtroom as "the jurors [a]re sent in through the back to answer questions" from the witness stand "with the other jurors outside of the courtroom." That procedure would have precluded other prospective jurors from seeing the proceedings at the bench during the questioning of their individual co-venire members. Although they were sworn trial participants, the prospective jurors were nonetheless members of the public who were entitled to view the *voir dire* proceedings.

In sum, we conclude that use of the husher during individual-juror *voir dire* did not constitute closure or partial closure of the courtroom, but instead was a "reasonable alternative [] to closing the proceeding," *Waller*, 467 U.S. at 48, that

---

[9] "[T]he constitutional values sought to be protected by holding open proceedings may be satisfied later by making a transcript . . . available within a reasonable time." *Press-Enterprise*, 464 U.S. at 512.

protected appellant's public-trial right.[10]  We therefore reject appellant's claim of error.

### III.

Complainant Campbell testified that upon viewing a photo array presented to him by MPD officers, he identified appellant as the shooter.  The photo array, with Campbell's initials written near a circle around appellant's face, was published to the jury.  Paige testified that he, too, "participated in an identification procedure with the police" and identified appellant as the shooter.  The government introduced into evidence and published to the jury the "list of faces that [the police] showed [Paige]."

---

[10]  We disagree with appellant's contention that *Jury Questionnaires* requires a different result.  In our opinion in *Jury Questionnaires*, we considered the issue of mid-trial and post-trial press "access to the jury questionnaires completed by the sixteen *empaneled* jurors," 37 A.3d at 882 (italics added), and held that the trial court erred in not recognizing the press's First Amendment right to such access and in failing to consider "alternatives to complete closure" of the questionnaires to public review.  We noted that the trial court "had no problem keeping oral *voir dire* open to the public," *id.* at 888, but we did not indicate whether a husher was used in the open courtroom and did not consider whether the press had a right to listen contemporaneously to oral *voir-dire* questioning of individual *prospective* jurors.

On appeal, appellant renews his at-trial objection to the trial court's decision to "admit[] and allow[] the prosecution to publish to the jury photo arrays containing [appellant's] mugshot." Appellant argues that the photo arrays did not satisfy the three-part test this court has adopted for admissibility. We conclude that any error in admission of the photo arrays was harmless beyond a reasonable doubt.

"For admission of 'mug shot type' photographs at trial: 1) [t]he government must have a demonstrable need to introduce the photographs; and 2) [t]he photographs themselves, if shown to the jury, must not imply that the defendant has a prior criminal record; and 3) [t]he manner of introduction at trial must be such that it does not draw particular attention to the source or implications of the photographs." *See Bishop v. United States*, 983 A.2d 1029, 1034 (D.C. 2009). Appellant argues the government did not have "a demonstrable need to introduce the photographs" because "identification was not in issue": appellant admitted that he was the shooter, and his trial counsel signaled in her opening statement that appellant's defense to the AWIKWA charge was self-defense. The government retorts that it carried the "burden to prove appellant committed the charged offenses through admissible evidence" and that Campbell's and Paige's immediate

ability to identify appellant "was significant evidence supporting their credibility as witnesses."

We think appellant has the better of the argument about whether there was a demonstrable need to introduce the photo arrays. Campbell told the jury that he circled on the photo array (Government Ex. 7) the photo of "the defendant who shot me" and said at the time, "That's definitely him. I am never going to forget someone that shot me." Similarly, Paige told the jury that upon identifying appellant on the photo array (Government Ex. 10), he made the statements, "That's the guy. I remember him. I won't forget his face." Given all the foregoing, we assume (though without definitively deciding) that, as in (*Kirkland*) *Williams v. United States*, 382 A.2d 1 (D.C. 1978), the government had "no reason to show identification" at trial. *See id.* at 5 ("The government adduced more than sufficient testimony regarding positive photographic identification of appellant to satisfy that need [to survive a motion for judgment of acquittal]; it was not necessary to introduce the photos themselves.").

We must next consider whether any error in permitting introduction of the photo arrays was harmless beyond a reasonable doubt. *See* (*Lenwood*) *Williams v. United States*, 481 A.2d 1303, 1304 (D.C. 1984) (applying the constitutional

harmless error standard articulated in *Chapman v. California*, 386 U.S. 18 (1967)). The reason for the "rigid criteria for . . . admissibility" of mugshots is that "introduction of mug shots into evidence . . . pose[s] a danger to the defendant's rights by their potential for implying a prior criminal record." *Letsinger v. United States*, 402 A.2d 411, 414 (D.C. 1979).[11] Examining the photo arrays, the trial judge noted that the photos do not include "prison garb" and have "a gray or dark gray background," and that "it" — it's unclear whether the court was referring to appellant's photo or the entire photo array — "doesn't look . . . like a mugshot." Looking at the exhibits ourselves, we agree with the trial judge's first two observations; as to the court's third observation, in our view the unsmiling expressions on the men's faces do suggest that the photos may be mugshots, though appellant's photo in the array looks less like a mugshot (and, perhaps, more like a driver's license photo) than most of the other photos. In addition, it is significant that the mugshot serial numbers, the mugshot.com caption, and the

---

[11] The photo array was of nine African-American men, including appellant. In the view of the author of this opinion, unnecessary publication to District of Columbia juries of photo arrays of African-American men also poses a danger of fostering unconscious bias. *See Gause v. United States*, 959 A.2d 671, 692 n.7 and n.8 (D.C. 2008) (Blackburne-Rigsby, J., dissenting) (citing a study showing that "although all racial groups harbor a significant amount of unconscious anti-Black bias, the distinction between Blacks and non-Blacks attitudes is great," with "71.5% of Whites, 67.5% of Asians, and 60.5% of Latinos harbor[ing]" an unconscious anti-Black bias, compared to 32.4% of Blacks, and a study showing that "there may be race bias against the selection of Blacks in jury wheels and master jury lists"), *rev'd on other grounds*, 6 A.3d 1247 (D.C. 2010) (en banc).

caption "line up with serial numbers" were removed from the photo-array sheet published to the jury. Further, the detective who prepared the photo arrays shown to Campbell and Paige made no mention of the source of the photos in the array.

But even if the jurors could discern that the photos were mugshots, they also knew from the parties' stipulation regarding the "certificate of non[-]registration of a firearm in Washington, D.C. for [appellant]" (which the trial court instructed was "undisputed evidence"), and from the trial court's instructions on the elements of the charged offenses of UF and UA,[12] that appellant did not dispute that he acted in violation of District of Columbia law by bringing an unregistered firearm and ammunition into the District. Despite learning that appellant had broken the law in that way, the jury acquitted him of the charged AWIKWA (car) offense, a verdict we take as evidence that jurors were able to weigh whether the evidence supported conviction notwithstanding the undisputed information they had about appellant's non-compliance with the District's gun laws, which went beyond what an arrest mugshot implies. For that reason, we conclude that introduction of the photo arrays into evidence was harmless beyond a reasonable doubt.

---

[12] *I.e.*, that "[t]he firearm had not been registered to [appellant], as required by District of Columbia law" and that appellant lacked "a valid registration certificate for a firearm of the same gauge or caliber as th[e] ammunition" he possessed.

**IV.**

Appellant asserts that the prosecutor "seriously misstated the law" during his rebuttal closing argument when, after reminding the jury of appellant's testimony that "he was worried . . . that the people supposedly beating him up could get his gun," went on to remark that appellant had "brought the gun to the neighborhood," and then told the jury that "a person can't claim self-defense[] if they put themselves in the position to ca[u]se the trouble." In addition, appellant highlights that after the court overruled defense counsel's objection to the prosecutor's language, the prosecutor continued his rebuttal by "listing, among the reasons [why appellant] did not act in self-defense, the fact that [appellant] brought that gun there to begin with." Appellant argues that through the foregoing remarks, the prosecutor effectively told the jury that it should find that appellant "forfeited his right to self-defense simply by choosing . . . to carry a gun."

"When evaluating a claim of improper prosecutorial argument, we first determine whether or not the challenged argument was improper." *Turner v. United States*, 26 A.3d 738, 742 (D.C. 2011). "If the argument was improper, we then determine whether or not reversal is warranted, considering (1) the gravity of

the improper comments; (2) their relationship to the issue of guilt; (3) the effect of any corrective action by the trial judge; and (4) the strength of the government's case." *Id.*; *see also Finch v. United States*, 867 A.2d 222, 225-26 (D.C. 2005). "If an objection was preserved," we may "'affirm the convictions [if] we are satisfied that the appellant did not suffer 'substantial prejudice' from the prosecutor's improper comments." *Id.* at 226 (citing *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)).

Acknowledging this court's case law,[13] the government concedes that "a defendant may be entitled to a self-defense claim even when in unlawful possession of a firearm." The government argues, however, that the prosecutor's remarks did not imply the contrary. Reviewing the prosecutor's remarks as a whole, we are persuaded by the government's argument. *See, e.g.*, *Jones v. United States*, 739 A.2d 348, 353 (D.C. 1999) ("A criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements must be viewed in context." (internal quotation marks omitted)). Although in isolation, the remarks appellant highlights may have conveyed the erroneous message about which appellant complains, in his additional remarks, the prosecutor focused on the principle that there is no "right to use excessive force"

---

[13] *See, e.g.*, *Stewart v. United States*, 687 A.2d 576, 579 (D.C. 1996).

and then made statements from which we think the jury would have understood that use of the gun in a non-excessive way would have been permissible in self-defense if appellant had perceived that he was in danger. The prosecutor completed his theme by saying: "He brought that gun there. He didn't fire a warning shot. He didn't brandish it." The prosecutor's references to firing a warning shot and merely brandishing the gun were acknowledgments that although appellant was not entitled to use excessive force, he might have been entitled to use the gun in those non-lethal ways to protect himself.

Moreover, it was undisputed from the outset that appellant brought the gun to the scene, and, at various junctures, the jury learned that this did not preclude a finding that appellant acted in self-defense. For example, during defense counsel's opening statement, she told the jury that they would hear that appellant pulled his gun out from his waistband when he was terrified that two men were going to kill him, and then told the jury that appellant, like everyone, has "the right to use reasonable force in self-defense." The prosecutor objected and the court had a conference with counsel at the bench, but after the conference had concluded, defense counsel continued her opening statement by saying that "every citizen has a right to self-defense . . . when that person actually believes he . . . is in imminent danger of serious bodily harm, and when there are reasonable grounds for that

belief." When the prosecutor objected again, the trial court overruled his objection in open court. We think this exchange would have conveyed to the jury that self-defense was not out of the case just because appellant brought a gun to the scene.

The court's instructions to the jury lead us to the same conclusion. The court told the jury that the defense theory regarding the charge of AWIKWA (firearm) charge was that "it was reasonable for [appellant] to believe he was in imminent danger of serious bodily injury or death" and that he "used the degree of force reasonably necessary to defend himself." Thereafter, the trial court gave the jury a lengthy self-defense instruction that included the statement that "[i]f Jonathan Blades actually and reasonably believed he was in imminent danger of death or serious bodily harm, and that deadly force was necessary to repel such danger, then he may use deadly force in self-defense." The trial court also specifically told the jury that "[s]elf-defense is a defense to the charge[] of [AWIKWA] Firearm." The court's instructions thus conveyed to the jury that appellant's possession of a firearm did not preclude his claim of self-defense.

Further, even if we assume *arguendo* that the prosecutor's comments did imply that appellant had forfeited his right to self-defense by bringing a gun to the scene, we would still conclude that appellant did not suffer "'substantial prejudice'

from the prosecutor's improper comments" (quoting *Finch*, 867 A.2d at 226). We note first that the jury had ample basis for rejecting appellant's claim that his actions were in self-defense. The evidence showed that appellant shot his gun nine times; that Campbell, who appellant claims was his assailant, was shot not while facing appellant, but in his back or angled shoulder; and that one of the bullets landed around the corner from the location where appellant testified he began firing his gun. There was also evidence (the absence of stippling) that permitted the jury to infer that Campbell had not been shot when he was in close proximity to appellant's gun. In total, the government's evidence suggested that appellant was shooting at and pursuing targets who were running away from him rather than placing him in imminent danger of bodily harm. Indeed, it seems likely, notwithstanding the competing expert testimony about where the shooter might have been standing when the shots were fired, that the jury would have found the photographic evidence of where the casings came to rest — in a line going up 20th Street toward L Street — and the testimony about the bullet found around the corner on L Street to be strong evidence that appellant was pursuing Campbell.

Further, the jury, which was given an option of convicting appellant of the lesser-included offense of assault with a dangerous weapon (firearm) ("ADW (firearm)"), convicted appellant of AWIKWA (firearm). If jurors had credited

appellant's testimony that he acted in self-defense but believed they were precluded from acquitting appellant on that basis simply because he had brought a gun into the District, they presumably would have convicted him of the lesser-included ADW offense and not of AWIKWA (firearm). In convicting appellant of AWIKWA (firearm), the jury necessarily found that appellant acted with an intent to kill when he shot Campbell.[14] For that and all the foregoing reasons, we conclude that even if improper, the prosecutor's remarks did not prejudice appellant, and the trial court did not reversibly err in not taking corrective action.

## V.

Appellant's final argument is that the trial court committed reversible error by giving, without a sufficient evidentiary basis, a provocation instruction that told the jury that "[o]ne who deliberately puts himself in a position where he has reason to believe that his presence will provoke trouble cannot claim self-defense." The court additionally instructed the jury that "if one, who is the aggressor or provokes a conflict, later withdraws from it in good faith and communicate[s] that

---

[14] The jury was instructed that one of the elements of AWIKWA, "which the [g]overnment must prove beyond a reasonable doubt" in this case, was that "Jonathan Blades intended to kill Johnny Campbell," but that for a conviction of ADW, "the [g]overment need not prove the defendant intended to injure Johnny Campbell."

withdrawal by words or actions, he may use deadly force to save himself from imminent danger or death or serious bodily harm."

A provocation instruction "is appropriately given when there is both evidence of self-defense and evidence that the defendant provoked the aggression from which he was defending himself." *Rorie v. United States*, 882 A.2d 763, 775 (D.C. 2005). We have observed that "where the giving of the instruction is technically incorrect, the error generally is harmless." *Id.* Under some circumstances, however, such as "where there are earlier discrete episodes of an aggressive, even violent nature," an inappropriately given provocation instruction presents a danger that the jury could have been "confused by the earlier 'provocative' behavior of the defendant that did not operate as a legal trigger of the final . . . confrontation between the victim and the defendant." *Id.* In any event, "it is axiomatic that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Dickerson v. United States*, 620 A.2d 270, 273 (D.C. 1993) (internal quotation marks omitted).

The government cites, as evidence of provocation that warranted the provocation instruction, appellant's testimony that after Campbell "grabbed [Mitchell] by the hips," appellant "grabbed [Campbell] by his shoulder" and

"turned [Campbell] toward [him]." Whether or not this sufficed as evidence of provocation, we are satisfied that the jury would not have viewed it as conduct that deprived appellant of the right to self-defense or as the trigger of the gun violence that followed. Under appellant's account, what happened immediately afterwards was that Mitchell pulled appellant away "because she . . . didn't want the argument to escalate," appellant and Mitchell walked towards appellant's car, and appellant attempted to get into the car — i.e., actions by which appellant signaled his withdrawal from the conflict. Under the account presented by Campbell and Paige, after Campbell knocked appellant down, Campbell moved away from appellant and was pursued by Mitchell, who was hitting Campbell in the head with her high-heeled shoe; and appellant went to his car to retrieve a gun and began shooting at the fleeing men.

If the jurors credited appellant's account, the court's withdrawal-from-the-conflict instruction let them know — notwithstanding appellant's previous aggressive action in grabbing Campbell's shoulder or pushing him — that by his actions to disengage, appellant was restored to his right to use deadly force to save himself from the danger of death or serious bodily harm he told the jury Campbell, Paige, and Rob imminently posed when they followed him to his car. If on the other hand the jury credited the Campbell/Paige account, appellant acted as the

aggressor and not in self-defense during the "final episode" of the incident, *Rorie*, 882 A.2d at 774, 777 — i.e., when Paige saw appellant loading a gun he had retrieved from his car, and when Campbell, who had retreated after blows to his head and who was fleeing northward on 20th Street after hearing Mitchell utter words that Campbell understood to mean that appellant was "going to get [his] gun." Either way, we see no danger that the jury would have confusedly thought that appellant's prior action of turning Campbell around by the shoulder or pushing Campbell was relevant to whether appellant was guilty of AWIKWA firearm. Stated differently, only upon a "'bizarre reconstruction' of the evidence," *Tyree v. United States*, 942 A.2d 629, 639 (D.C. 2008), could jurors have thought that appellant acted to ward off imminent harm to himself by shooting at Campbell but was not entitled to a self-defense claim because of the earlier shoulder-grab or push and the rule set out in the provocation instruction.

Further, as already noted, the jury was given an option of convicting appellant of the lesser-included offense of assault with a dangerous weapon (firearm), but convicted him of AWIKWA (firearm), meaning that it found that he acted with an intent to kill. If jurors believed appellant's account, and if what prevented them from acquitting him on the ground of self-defense was that they thought his grabbing of Campbell's shoulder or pushing of Campbell was

provocation that caused him to forfeit his self-defense claim, they presumably would have convicted him of the lesser-included ADW offense and not of AWIKWA (firearm).[15]  For that reason, too, we conclude that the court's giving of the provocation instruction, if error, was harmless; that is, we are satisfied that "the guilty verdict actually rendered in this trial was surely unattributable to the error." *Rorie*, *id.* at 776 (internal quotation marks omitted).

**

For all the foregoing reasons, we conclude that appellant is not entitled to a reversal of his convictions.  However, we remand the matter to the trial court to

---

[15]  In *Rorie* by contrast, the record was "without facts to support that Mr. Rorie was the aggressor or provocateur toward [the stabbing victim/decedent] in the moments before the stabbing, [and] the jury necessarily had to take into account prior, unrelated, and prejudicial acts of Mr. Rorie toward [another person] simply to make sense of the language in the [provocation] instruction." 882 A.2d at 769.  The fact that the jury acquitted defendant Rorie of second-degree murder while armed (knife) and convicted him of the lesser-included offense of voluntary manslaughter while armed, *id.* at 764, suggested that jurors might have accepted his self-defense claim but for the inappropriately given provocation instruction.

merge appellant's two PFCV convictions premised on his AWIKWA and AAWA convictions.[16]  In all other respects, the judgment of the trial court is

*Affirmed.*

FARRELL, *Senior Judge*, concurring in part and concurring in the result:  I agree with Judge Thompson's analysis of why use of the husher during voir dire did not violate appellant's right to a public trial.  I also agree with her conclusion that, although the government showed no demonstrable need to introduce the photo arrays, any error in their admission was harmless beyond a reasonable doubt.  That is partly for the reasons stated by Judge Thompson, *ante* at 23-24, but also because I believe that, rather than any inference of prior arrest implied by the photo arrays, it was the strong inconsistency between appellant's defense of self-defense and the evidence that produced the guilty verdicts.  The shell-casing evidence, among other things, was at odds with appellant's story that immediately fearing for his personal safety he took out his gun and repeatedly fired at Johnny Campbell in an impromptu act of self-defense.  Nine expended shell-casings were found lying

---

[16]  *See Nixon v. United States*, 730 A.2d 145, 153 (D.C. 1999) (holding that PFCV convictions arising out of "a single possession of a single weapon during a single violent act" must "merge into one PFCV conviction").

in roughly a straight line extending twenty feet and more along 20th Street. According to firearms examination expert Barrett, this pattern showed that the shooter was walking and firing along the line where the casings fell. That evidence was consistent with Campbell's account, corroborated by eyewitness Page, that after an exchange of punches appellant withdrew to his car, retrieved a handgun or ammunition for it, then turned and fired multiple shots at Campbell, each requiring a separate trigger-squeeze, as Campbell ran from the scene. Additional evidence summarized by Judge Thompson also confirms that "appellant was shooting at and pursuing targets who were running away from him" and thus not "placing him in imminent danger of bodily harm." *Ante* at 29.[1]

The hardest issue in this appeal is the prosecutor's repeated erroneous suggestion in rebuttal argument that appellant had forfeited self-defense by the act of bringing "the gun to the fistfight" or "to the neighborhood." Although the trial judge appeared to recognize this error later, he overruled appellant's contemporaneous objection to it and, in instructing the jury on provocation ("[o]ne who deliberately puts himself in a position where he has reason to believe that his

---

[1] Unlike Judge Thompson, however, I do not believe we should draw speculative inferences, *ante* at [25-26], from the jury's acquittal of appellant of the assault charge based on his use of a car.

presence will provoke trouble cannot claim self-defense"), gave arguable support to it.[2] Nevertheless, like Judge Thompson, I am confident the jury did not reject self-defense because of appellant's having "brought the gun downtown," but instead because of his excessive use of force in the circumstances. "I will give you the first nine reasons why this was not a case of self-defense," the prosecutor began rebuttal argument: "Bam, bam, bam, bam, bam, bam, bam, bam, bam . . . the defendant standing there at the top of that block, walking forward, shooting as he goes. . . ." As stated above, the combined ballistics evidence and testimony of Campbell and Paige strongly favored this scenario of appellant retreating to his car for a gun or ammunition and then firing repeatedly at Campbell when any threat of harm from Campbell or his friends had largely dissipated. The eyewitness and ballistics testimony, the opening statements and closing arguments of the parties, and the jury instructions all focused primarily on this issue of whether, in firing the gun, appellant had used force he actually and reasonably believed necessary to avert immediate harm to his person. While the prosecutor tried to score extra points by erroneously relying on appellant's possession of the gun from the start, I am convinced that this ultimately did not distract the jury from evaluating

---

[2] Other than the risk it provided of buttressing the prosecutor's mistaken argument, the provocation instruction itself was unobjectionable in a case where the jury could find, as the most reasonable hypothesis, that rather than withdraw from the scene appellant unnecessarily increased the danger of harm by going to his car and retrieving the gun or ammunition.

appellant's actual use of the gun and convicting him based on evidence redolent of excessive force.[3]

BECKWITH, *Associate Judge*, dissenting: Several clear principles have emerged from the case law on a criminal defendant's Sixth Amendment right to a public trial. We know that the purpose of this right is to benefit the accused, *Gannett Co. v. DePasquale*, 443 U.S. 368, 380 (1979), and that the right is at least as protective as the press and the public's First Amendment right to public trial, *Waller v. Georgia*, 467 U.S. 39, 46 (1984). We know that contemporaneous review of court proceedings is critical to the right's protections,[4] and that a transcript is therefore not generally a meaningful substitute.[5] Most pertinent to the

---

[3] Similar to my earlier caveat, however, I cannot join Judge Thompson's speculation, *ante* at 29-30, that the jury's conviction of AWIKWA (firearm) rather than ADW was further indication that it was not prejudiced by the improper closing argument.

[4] *See In re Oliver*, 333 U.S. 257, 270 n.25 (1948) ("The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions.") (quoting Cooley, Constitutional Limitations (8th ed. 1927) at 647).

[5] *Presley v. Georgia*, 558 U.S. 209, 214 (2010) (holding that the defendant's public trial right was violated notwithstanding the availability of a transcript); *ABC, Inc. v. Stewart*, 360 F.3d 90, 99 (2d Cir. 2004) (holding that "where a right of

(continued…)

present case, we know that the right extends to jury selection, *Presley v. Georgia*, 558 U.S. 209, 213 (2010) (describing this as "well settled"), and that closing the voir dire proceedings in a criminal trial will violate the right to public trial unless it satisfies the four-part test of *Waller v. Georgia*: "To close a proceeding: (1) the party seeking closure must advance an 'overriding interest that is likely to be prejudiced'; (2) the closure must be 'no broader than necessary to protect that interest'; (3) the court must consider 'reasonable alternatives' to closure; *and* (4) the court must 'make findings adequate to support the closure.'" *Rodriquez v. Miller*, 537 F.3d 102, 108 (2d Cir. 2008) (citing *Waller*, 467 U.S. at 48).[6] And finally, we know that a closure that does not satisfy the four-part *Waller* test is structural error that requires reversal.[7]

---

(…continued)

access exists, a court may not deny access to a live proceeding solely on the grounds that a transcript may later be made available") (citation omitted); *In re Jury Questionnaires*, 37 A.3d 879, 884 (D.C. 2012) (noting that "it is when the trial is unfolding that the public's interest is greatest").

   [6] "[T]he *Waller* test is rightly regarded as a rule of general applicability in the courtroom closure context." *Rodriquez,* 537 F.3d at 108.

   [7] *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148–49 (2006) (describing structural errors as those that "defy analysis by 'harmless-error' standards because they affect the framework within which the trial proceeds," and including within the category of structural errors "the denial of the right to public trial" (internal brackets and quotation marks omitted)); *see also Littlejohn v. United States*, 73

(continued…)

In this case, the trial court decided that spectators of Mr. Blades's criminal trial would be able to see—but not hear—the questioning of prospective jurors regarding their responses on jury questionnaires based on a generalized view that jurors are more forthcoming and candid under the cover of the husher. My colleagues in the majority do not dispute that such a generalized justification would fail the *Waller* test. They conclude, however, that "the husher procedure in this case . . . does not amount to a closure or partial closure of the courtroom, but is more appropriately viewed as an alternative to closure." *Ante* at 18. Such an "alternative to closure," they assume, is not subject to *Waller*'s prerequisites.

Although I am cognizant of the ramifications of recognizing a constitutional problem with an apparently widely used Superior Court practice, I dissent from my colleagues' decision to uphold that practice here because it is impossible to reconcile the majority's view of the husher procedure as somehow exempt from *Waller*'s requirements for proposed limitations on a public trial with the Supreme

---

(…continued)

A.3d 1034, 1042 (D.C. 2013) (stating that "if a defendant's right to a public trial has been violated—i.e., if the four *Waller* criteria were not met—he need not show specific prejudice resulting from that violation." (citing *Waller v. Georgia*, 467 U.S. 37, 49) (1984)).

Court's public trial cases and with the decisions of this and other courts.[8]  As an initial matter, my colleagues do not explain why limitations short of closing the courtroom door are not subject to the *Waller* test.  And in fact, with the exception of *Copeland v. United States*, 111 A.3d 627 (D.C. 2015), which I address *infra*, the only case I have found that addresses a challenge on public-trial grounds to the particular practice used in this case never questioned that the use of a husher during voir dire was a type of closure subject to the requirements of *Waller*.  *See In re Memphis Pub. Co.*, 887 F.2d 646, 648–49 (6th Cir. 1989) (citing *Waller*'s precursor *Press-Enterprise Co. v. Superior Court of California*, 464 U.S. 501, 510 (1984)).  In *Memphis Publishing*, the Sixth Circuit reversed without any harm analysis because the trial court's justification for using the husher during jury selection was too general and "without any specific finding of fact to support [it]." *Id.*  Similarly, although the majority relies heavily upon obstructed view (hear-but-not-see) cases in support of its view that the see-but-not-hear approach employed here is an "alternative to closure," those cases all make clear that a trial court's use of a screen to obstruct the public's view of a witness or a proceeding is deemed constitutional only where the court first satisfied the *Waller* criteria.  *See infra.*

---

[8]  The trial court itself acknowledged that there was "a lot of strong language out there" in case law addressing the right to public trial and that it was not "by any stretch obvious" or "abundantly clear" that the approach was proper.

Whatever we call the husher procedure—a closure, a partial closure, or an alternative to closure—and however longstanding and accepted the Superior Court practice may be, its routine employment based on generalized concerns about juror candor is the antithesis of applying and satisfying the *Waller* factors, which require, among other things, individualized and adequately supported findings demonstrating the necessity of the closure in the specific circumstances of that case.

In case after case, the Supreme Court and other appellate courts have held that limitations upon the public's access to jury selection procedures were unconstitutional, not based on the particular form of closure, but because the trial court imposed it without satisfying the criteria of *Waller.* In *Cable News Network, Inc. v. United States*, 824 F.2d 1046 (D.C. Cir. 1987), for example, the D.C. Circuit summarily reversed the district court for failing to provide individualized, case-specific justification for allowing each prospective juror in a criminal case to choose whether to be "questioned in open court or *in camera*" regarding their answers to the questionnaire they were given. *Id.* at 1048–49. And more recently, in *Jury Questionnaires*, 37 A.3d 879, where the Washington Post challenged a D.C. Superior Court judge's ruling denying the newspaper access to the completed jury questionnaires of prospective jurors in a high profile murder case, we

considered the questionnaires to be part of the jury selection process and thus subject to the presumption of access (and to the *Waller* test) under the Supreme Court public trial cases. *Id.* at 885–87. Much like in the present case, the trial court in *Jury Questionnaires* expressed generalized concerns about the candor of prospective jurors in justifying the decision to deny access to the questionnaires. Because the trial court did not "articulate specific protectible privacy interests" or "consider alternatives to complete closure to protect those interests," we held that this "blanket closure" ran afoul of the constitutional right of access to the trial—a right the press enjoys as a surrogate for the public. *Id.* at 882, 887–89.

As mentioned above, the obstructed-view cases the majority cites as examples of "alternatives to closing" likewise expose the flaw in the notion that these purported "alternatives"—and by analogy, the see-but-not-hear procedure in this case—are not impermissible closures if they fall short of the requirements the Supreme Court has repeatedly stated must be met before a trial court restricts the public's access to a criminal trial. Every case the majority cites is a case in which the approved-of alternative was tailored to the case based on a finding of compelling need grounded in the specific circumstances, as opposed to the husher procedure in this case, which was employed as a matter of longstanding practice based on generalized concerns and without individualized findings about a case-

specific privacy interest at stake.

In *Pearson v. James*, 105 F.3d 828 (2d Cir. 1997), for example, the Second Circuit granted habeas relief where the trial court closed the courtroom during an undercover officer's testimony because, even though the trial court had met three of the four factors of *Waller*,[9] it failed to consider reasonable alternatives to the proceeding, the third requirement of *Waller*.[10] *Id.* at 830–31. When the court stated that placing a screen between the public and the testifying officer would have been an alternative to closure, *id.* at 30, that meant it would have been a reasonable alternative after the court had satisfactorily established, with

---

[9] The court did this by identifying an overriding interest in preventing exposure of the officer's identity and making specific and adequately supported findings that the closure was no more extensive than required to protect the interest asserted. *Waller*, 467 U.S. at 830.

[10] On rehearing en banc, the Second Circuit—granting review in *Pearson* and two other cases raising public trial issues on habeas—changed course and affirmed the district court's denial of Mr. Pearson's habeas petition after reconsidering and backing away from the holding of a prior Second Circuit decision, *Ayala v Speckard*, 89 F.3d 91 (2d Cir. 1996) (*Ayala I*), that a trial court was required to *sua sponte* consider alternatives to closing the court during the testimony of one witness. *Ayala v Speckard*, 131 F.3d 62 (2d Cir. 1997) (en banc) (*Ayala II*). More than a decade later, however, the Supreme Court clarified that its own precedent—specifically *Waller* and *Press-Enterprise Co. v. Superior Court of California*, 464 U.S. 501, 510 (1984)—had all along established, contrary to the view of the en banc Second Circuit, "that trial courts are required to consider alternatives to closure even when they are not offered by the parties." *Presley v. Georgia*, 558 U.S. 209, 214 (2010).

individualized findings supported by the record, that there was an overriding interest warranting some type of closure. Each of the other obstructed-view cases on which the majority relies holds exactly that: that the use of a screen to prevent the public from seeing a particular witness was not a violation of the right to a public trial because the court employing this method satisfactorily jumped through the *Waller* hoops.[11] These courts' exacting adherence to *Waller*'s stringent test underscores the distinction between their particularized scrutiny and the routine employment of the husher in Superior Court voir dire proceedings and shows why the jury selection procedure in this case violated Mr. Blades's public trial right. Whether these sorts of restrictions on jurors' ability to see or hear certain court proceedings are called closures or alternatives, they only become reasonable—and

---

[11] *See United States v. Lucas*, 932 F.2d 1210, 1217–18 (8th Cir. 1991) (upholding the use of a screen, which was the government's initial request, where the trial court made specific individualized findings that an officer's life would be in danger if she testified publicly, concluded that the government had established two overriding interests likely to be prejudiced if the officer's identity was not concealed, and settled upon the use of a screen after considering complete closure of the courtroom and the use of a disguise); *State v. Schultzen*, 522 N.W.2d 833, 836 (Iowa 1994) (rejecting criminal defendant's contention that ordering his family members to sit behind a screen during parts of the child victim's testimony violated his right to public trial where the trial court "met the requirements of *Waller*," including making adequate findings to support the screening); *Rodriquez v. Miller*, 537 F.3d 102, 110 (2d Cir. 2008) (holding that the proposed use of a screen during an undercover officer's testimony did not violate clearly established federal law where the state courts properly applied the *Waller* test and satisfied its factors with findings regarding two overriding interests that were firmly anchored in the record).

constitutional—by surviving the test designed to confine them to the most exceptional circumstances.

Given the strong presumption of openness, the majority's effort to distinguish cases that could more naturally be cited in support of Mr. Blades's argument in this case is perplexing. And yet my colleagues say that *Cable News* does not support reversal here because it held the public trial right was violated when the questioning of individual jurors was conducted "*in camera*," a phrase that was left unexplained in the decision but that my colleagues are comfortable concluding does not encompass private or inaudible proceedings at the bench. *But see, e.g.*, *Bennett v. United States*, 797 A.2d 1251, 1254 (D.C. 2002) (stating that "the prosecutor provided the requested material to the trial judge *in camera* at an *ex parte* bench conference"); *United States v. Minsky*, 963 F.2d 870, 874 (6th Cir. 1992) ("The court stated that the *ex parte* bench conference was part of its *in camera* review of the FBI 302s for the express purpose of ruling on the defense motions under both the Jencks Act and *Brady*.")

The majority similarly distinguishes *Jury Questionnaires* on remarkably narrow grounds. According to my colleagues, for example, *Jury Questionnaires* does not support reversal in this case (1) because it did not address the specific issue in the present case—namely, "whether the press had a right to listen

contemporaneously to oral *voir-dire* questioning of individual *prospective* jurors," *ante* at 20 n.10, and (2) because it involved access only to the questionnaires completed by *empaneled* jurors. These are both true, but are not good reasons to treat the use of the husher differently. My colleagues in the majority also recognize the potential relevance of the court's statement in *Jury Questionnaires* that the trial court "had no problem keeping oral *voir dire* open to the public," which seems to suggest that voir dire was conducted openly in that case and that the court recognized the importance of that openness. But the majority downplays the significance of this statement because the court did not specifically say whether a husher was used in *Jury Questionnaires*. Aside from the unlikelihood that the Washington Post would have failed to challenge any procedure that prevented its reporters from hearing the voir dire in that case, if the trial court had utilized a husher at voir dire, the judge probably would not have said at a hearing that "the press *had heard* all the individual questioning of prospective jurors," *Jury Questionnaires*, 37 A.3d at 884 (quotation in the appellate opinion and emphasis added). *See also id.* at 888 (referring, in the course of a discussion about jury candor, to "keeping oral *voir dire* open to the public").

In the end, the idea that the right to public trial is not violated by a practice that keeps the public from hearing what is going on during jury selection cannot be

squared with the values the Supreme Court has said the public trial right serves. Ensuring "that judge and prosecutor carry out their duties responsibly," "encouraging witnesses to come forward," and "discouraging perjury," *Waller*, 467 U.S. at 46; *see also Jury Questionnaire*, are best accomplished by people who can hear the proceedings. We should follow the Sixth Circuit's lead in holding that making voir dire inaudible to spectators can violate that right—and that it *will* violate that right if it is not supported by case-specific findings that there is a compelling interest justifying some form of closure and that the chosen method of protecting that interest is no broader than necessary to do so. *See Memphis Publishing*, 887 F.2d at 648–49. *"*[T]he sensible course is for the trial judge to recognize that open trials are strongly favored, to require persuasive evidence of serious risk to an important interest in ordering any closure, and to realize that the more extensive is the closure requested, the greater must be the gravity of the required interest and the likelihood of risk to that interest." *Ayala v. Speckard*, 131 F.3d 62, 70 (2d Cir 1997) (en banc) (*Ayala II*).

Finally, although the majority does not ultimately decide the matter, the parties in this case have thoroughly briefed and argued the question whether our decision in *Copeland v. United States*, 111 A.3d 627 (D.C. 2015), precludes reversal in this case because we are bound by its statement that it was "not

persuaded by the argument that [the defendant's] right to public trial was violated by the procedures used during the selection of his jury"—procedures the court described as "conducting a limited amount of individual voir dire at the bench with a 'husher' on." *Id.* at 633. In the government's view, this constitutes a holding by this court that the practice at issue in this case does not violate the right to a public trial. Mr. Blades counters that the court's statement in *Copeland* was unnecessary to its decision that trial counsel was ineffective by failing to inform Mr. Copeland of his right to be present at the bench during the voir dire of jurors.[12] Mr. Blades also argues that to the extent *Copeland* did resolve the question in this case, that holding was inconsistent with *Jury Questionnaires* and we are required to follow the earlier decision. *See Thomas v. United States*, 731 A.2d 415, 420 n.6 (D.C. 1999).

While *Copeland* is not easily reconciled with *Jury Questionnaires* or, for that matter, with the whole body of Supreme Court case law on the right to public trial, what qualifies as a holding in a case and whether one of our decisions fails to adhere to prior authority are difficult questions. The court's decision today exacerbates and prolongs the uncertainty caused by this tension between *Jury*

---

[12] In support of this argument, Mr. Blades highlights the *Copeland* court's statement that "we base our decision solely on appellant's failure to satisfy the prejudice prong in *Strickland*[.]" *Id.* at 631 n.5.

*Questionnaire*'s holding (that the preclusion of media access to jury questionnaires in a criminal trial based on generalized concerns alone violates the public's right to be present at jury selection) and the language in *Copeland*, now reinforced by this court (that a practice that precludes all members of the public from hearing *voir dire* in a criminal case does not violate a defendant's right to public trial, even when the trial court imposes the practice without making individualized findings justifying the closure and without satisfying the other requirements of *Waller*). The majority does not give us a unifying principle for understanding what types of closures are subject to the *Waller* test and what types are not. The significance of the public trial right and the importance of maintaining uniformity among our cases and consistency with Supreme Court precedent may therefore make this case a good candidate for en banc consideration.

Although I would reverse the judgment of the Superior Court in this case based on the violation of the public trial right, I also take issue with some aspects of my colleagues' resolution of the remaining issues in this case—particularly their harmless error analysis.

In my concurring colleague's view, "[t]he hardest issue in this appeal" is the trial court's error in overruling Mr. Blades's objection to the prosecutor's statements in closing argument. *Ante* at 36. Judge Farrell and I are in agreement

that "the prosecutor's repeated . . . suggestion in rebuttal argument that appellant had forfeited self-defense by the act of bringing 'the gun to the fistfight' or 'to the neighborhood'" was "erroneous." *Ante* at 36–37. Unlike my colleagues, however, I am not confident the misstatements were harmless, particularly given that, as Judge Farrell also notes in his concurrence, the trial court's provocation instruction "gave arguable support" to the prosecutor's misleading arguments by asserting that a defendant "cannot claim self-defense" if he puts himself in a position to provoke trouble. *Ante* at 37.

My colleagues nevertheless think the prosecutor's misstatements could not have caused the jury to convict on improper grounds because the government's evidence, particularly the physical evidence, all but compelled the jury to reject Mr. Blades's self-defense claim by demonstrating his "excessive use of force" when he fired off nine shots while walking toward Mr. Campbell. Judge Farrell quotes the prosecutor's dramatic reenactment, in closing argument, of Mr. Blades "walking forward, shooting as he goes." *Ante* at 37. The majority likewise highlights the government's evidence "that appellant was shooting at and pursuing targets who were running away from him[.]"[13] *Ante* at 29. And to be sure, this is

---

[13] The majority's harm analysis focuses on what "the government's evidence suggested" and what the jury had "ample basis" for concluding. *Ante* at 29. The test for harm is not whether the government presented sufficient evidence

(continued…)

what the government's firearm examination expert surmised when he looked at a photograph showing where the expended shell casings landed. The expert's testimony is good evidence as far as it goes. The problem with making it the centerpiece of the majority's determination of harmless error, however, is that the overall evidence of the walking-shooter scenario is weak, there is evidence of a self-defense counter-narrative that the jury could have credited, and the record does not feature the kind of evidentiary lopsidedness that might assure us that the prosecutor's misstatements could not have played a role in the jury's verdict because no juror could have maintained any doubt that the government had disproved self-defense beyond a reasonable doubt.

There are several reasons the ballistics evidence is inadequate footing for my colleagues' conclusion that the jurors could not possibly have been distracted by the prosecutor's misstatements and followed their false lead to conviction. As an initial matter, the expert's pattern-recognition testimony was the only evidence of a walking-shooter scenario, and none of the actual witnesses to the shooting described anything like this. Contrary to Judge Farrell's view that "the combined

---

(…continued)

of the offense. At the very least, if we apply a *Kotteakos* standard, we must be able to conclude "with fair assurance" that the result of the trial was not substantially swayed by the error. *Kotteakos v. United States*, 328 U.S. 750, 765 (1946).

ballistics evidence and testimony of Campbell and Paige strongly favored this scenario," *ante* at 37, Mr. Campbell testified that he saw Mr. Blades shooting "with the car door open," while Mr. Paige said Mr. Blades shot in a "standing up-straight position" "in the middle of the street." Neither eyewitness described Mr. Blades as walking while shooting, and their accounts contradicted each other. Some of these discrepancies were minor and some were more consequential,[14] but it is fair to say the walking-shooter narrative that was so critical to the government's effort to disprove self-defense was not so airtight as to warrant my colleagues' faith in the harmlessness of the prosecutor's misstatements.

Apart from its lack of support from the other evidence, the government's expert's testimony also had its own vulnerabilities. The expert acknowledged that

---

[14] Mr. Paige testified that Mr. Campbell threw the first punch, but Mr. Campbell testified that he only hit Mr. Blades after Mr. Blades had already punched him in the face. As to the fight on the street, Mr. Campbell testified that he fought with Mr. Blades only on the sidewalk area and only until Ms. Mitchell chased him across the street. By contrast, Mr. Paige testified that Ms. Mitchell hit Mr. Campbell with a shoe until Mr. Paige pulled her off Mr. Campbell. Mr. Paige then explained that Mr. Blades and Mr. Campbell "kept wrestling and fighting," "steady punching each other" over the back of a trunk until they both "fell over to the middle of the street." And as to events earlier in the evening, Mr. Paige testified that the group consisted of "about five or six of us" while Mr. Campbell testified that there were "[a]bout nine of us." Mr. Paige testified that he and Mr. Campbell first saw Ms. Mitchell inside the Look Lounge, when she greeted and hugged them both, but Mr. Campbell testified that he did not see Ms. Mitchell in the club at all.

his moving-shooter conclusion was "based on generalities" and that he formed his opinion just that morning, shortly before taking the stand, after being shown for the very first time the photograph depicting the shell casings' location. He acknowledged that he had not actually visited the scene and was not aware of the slope of the street where the casings were found. The expert admitted that "[m]any, many variables" can affect where casings land and that they can bounce up to 21 feet and they can roll. Though he had not consulted any studies or reference books before reaching his conclusion that the shooter in this case was moving while shooting, during his testimony he recalled one comprehensive study that concluded there could be as much as 75 percent error in shell casing pattern recognition. The question is not whether the expert's walking-shooter opinion was relevant, or whether it supported the government's theory of the case. It was and it did. The question is whether it was so strong as to overwhelm the potential appeal, for any juror, of Mr. Blades's self-defense claim, and thus renders harmless the prosecutor's erroneous suggestion that Mr. Blades had relinquished his right to claim self-defense by bringing a gun to the neighborhood. It was not.

My colleagues' certainty about the power of the government's physical evidence is even less justified when one considers that the defense had a firearm expert too—one who, unlike the government's expert, had visited the scene, taken

measurements at the scene, and reviewed the police reports before forming his opinion that the pattern of shell casings supported a scenario involving a stationary shooter. Mr. Blades followed his expert's testimony with his own account of the incident and his take on the multiple gunshots and on Mr. Campbell's proximity: he testified that he committed the shooting in self-defense and that he fired his gun blindly after being struck in the head and upon threat of being stabbed, just trying to get the men away from him. Mr. Blades was undoubtedly an interested witness with an incentive to avoid being convicted, and the prosecutor's cross-examination gave the jury additional reasons to question his testimony as well. For its part, the government had its own problems with the credibility of its main witnesses, and acknowledged in its brief that the jury may have had reasons to doubt some of the testimony of Mr. Campbell and Mr. Paige. Most significantly, the jurors did not believe that Mr. Blades had tried to run Mr. Campbell over with his car, and their acquittal of Mr. Blades on the vehicular assault counts suggests they would have viewed the entirety of Mr. Campbell's testimony with some degree of skepticism. All of this is to say that the record in this case is not conducive to a finding of harmless error that is dependent upon the relative strength of the government's case—particularly where the error in question went to the central question whether Mr. Blades shot Mr. Campbell in self-defense and where it was the government's

burden to disprove self-defense beyond a reasonable doubt.[15]

As to the admission of the mugshots in this case, although the majority states that it is not "definitively deciding" that the government had "no reason to show identification" at trial, it also concludes—and in his concurrence, Judge Farrell agrees—that Mr. Blades "has the better of the argument about whether there was a demonstrable need to introduce the photo arrays." *Ante* at 22. We are in apparent agreement, then, that the government had no reason to introduce Mr. Blades's actual mugshot in a case where defense counsel admitted in opening statement that Mr. Blades was the shooter (in self-defense) and where the government presented "more than sufficient testimony regarding positive photographic identification" from its two eyewitnesses, Mr. Campbell and Mr. Paige. *See* (*Kirk*) *Williams v. United States*, 382 A.2d 1, 5 (D.C. 1978). As demonstrable need is one of three requirements the government must satisfy to justify admission of a mugshot-like

---

[15] In a portion of the opinion Judge Farrell explicitly does not join, Judge Thompson contends that the fact that the jury convicted Mr. Blades of assault with intent to kill while armed instead of the lesser assault with a deadly weapon means the jury must have rejected the theory underlying Mr. Blades's defense of self-defense because it found that he intended to kill Mr. Campbell. *Ante* at 38 n.3. I agree with Judge Farrell. "[E]ven an intentional killing, if it comports with legally accepted notions of self-defense, is not malicious; it is excused and accordingly no crime at all." *Comber v. United States*, 584 A.2d 26, 41 (D.C. 1990) (en banc) (citation omitted). The jury in this case could have believed that when Mr. Blades fired the gun, he was both defending himself against the threat of stabbing and intending to kill.

photo of a defendant in a criminal trial, *Bishop v. United States*, 983 A.2d 1029, 1034 (D.C. 2009), the admission of the array in this case was error.

My colleagues nonetheless go on to conclude that the introduction of the mugshot was harmless beyond a reasonable doubt. Judge Farrell's focus, in concurrence, is again upon "the strong inconsistency" between Mr. Blades's defense theory and the physical evidence. *Ante* at 35. The government likewise argues in its brief that it was "the obvious inconsistency of appellant's testimony with the physical evidence, and not any vague inference of prior arrest supposedly implied by the arrays, that produced the verdicts." But Mr. Blades's testimony was not inconsistent with the physical evidence—it was inconsistent with the government's expert's opinion of the physical evidence. The government concedes that Mr. Blades's testimony was consistent with the defense expert's opinion of the physical evidence, but dismisses the expert's testimony because "his analysis suffered from two flaws"—namely, that he used a different gun at a different location when conducting a test for comparison purposes and that he made a "self-contradictory claim" about the randomness of how expended casings land and the ability to see a pattern. These "flaws" were grounds for impeachment, not the absolute repudiation of Mr. Blades's theory of self-defense. As in (*Kirk*) *Williams*, Mr. Blades's account of the shooting "was not a wholly unlikely

possibility," *see* 382 A.2d at 7, and the jury could well have believed it.[16] I see no grounds in this record for rejecting the possibility that the combination of Mr. Blades's testimony and the defense expert's analysis could have created a doubt in the mind of at least one juror, particularly where it was the government's burden to disprove self-defense beyond a reasonable doubt.

As for the harmlessness analysis in the majority opinion, while I agree with my colleagues that the "unnecessary publication to District of Columbia juries of photo arrays of African-American men also poses a danger of fostering unconscious bias," *ante* at 23 n.11, the majority's grounds for nonetheless finding the admission of the mugshot of the African-American defendant in this case

---

[16] The government's own confidence that the admission of the mugshots was harmless error was substantially based upon an inadvertent but significant factual error that the government conceded at oral argument. Specifically, the government's assertions in its brief about the "obvious inconsistency" between the shell-casing evidence and Mr. Blades's account of the incident relied in part upon the force of the evidence that "[t]he expended casings were found lying almost in a straight line, over a distance of nearly 60 feet on 20th Street." The government subsequently repeated that evidence and emphasized its strength, asserting that Mr. Blades's expert "simply failed to give the jury any reason to accept the self-evident improbability that nine shell casings, fired from the same gun at the same time, would conveniently land in a nearly 60-foot line down the hill." But the government's brief was mistaken, and as the prosecutor noted at oral argument, the expended casings were arranged within a space that was closer to 20 feet in distance than 60 feet. The government's indication that "the expended casings were found lying almost in a straight line" is also different from the photograph of the casings' locations, which shows five casings in a line, two several feet off to the left of the line and two several feet off to the right.

harmless beyond a reasonable doubt do not assure me that the jury in this case did not "consider [Mr. Blades's] bad character in deciding whether to convict [him] of the charged crime." *Bishop v. United States*, 983 A.2d at 1034, 1038 (citation omitted). At the outset, that the men photographed were not in prison garb, that someone removed the mugshot serial numbers, and that the detective who created the arrays did not call them "mugshots" mean little when, as the majority acknowledges, the "unsmiling expressions" on the faces of the men pictured in the photo array still make the photos look like mugshots. See *ante* at 23. And the array still bore indications that it had been altered, in the rough edge that was left when "mugshot.com" was removed and in the mark at the top hiding the reference to serial numbers. In any event, as this court noted in *Williams*, the exceptional circumstances in which cleaned-up mugshots might be deemed admissible are limited to those circumstances in which the government proves a demonstrable need. *See* 382 A.2d at 5.

I also cannot agree that the introduction of the mugshot was harmless beyond a reasonable doubt on the ground that the jury had already learned from the evidence at trial that Mr. Blades actually broke the law by bringing an unregistered firearm and ammunition into the district. According to Judge Thompson, the jury's acquittal on the car-related assault showed that the jury could weigh the

evidence unaffected by knowledge that Mr. Blades was a lawbreaker. *Ante* at 24. On this point I align with Judge Farrell, who states in his concurrence that we should not "draw speculative inferences" from these acquittals. See *ante* at 36 n.1. But in any event, given how many states have far less restrictive gun laws than the District's and how some have no registration requirements at all, I am not as confident as Judge Thompson that Mr. Blades's possession of a gun contrary to the laws of the District "went beyond what an arrest mugshot implies." *Ante* at 24.

In *Williams*, this court held that the use of mug shots was not harmless where the complainant's account of a violent attack was not corroborated by physical evidence. 382 A.2d at 7. Here, by contrast, my colleagues are confident, albeit for different reasons, that the inference of prior arrest from the admission of the mugshot did not cause the jury to reject Mr. Blades's self-defense claim. But this is a case where the parties presented competing expert testimony supporting their respective accounts of how things happened, where there were strengths and weaknesses to both versions but no glaring lopsidedness or foregone conclusions, where the defendant had a motive to lie but presented a viable story of self-defense consistent with the defense expert's testimony, where the jury discredited the complainant's testimony about a separate incident after the shooting, and where the government's witnesses were neither united nor concretely helpful in corroborating

the government's ballistics expert. Under these circumstances, the jury "might well have been influenced because of the improper, indirect proof of [Mr. Blades's] criminal past." *Bishop*, 983 A.2d at 1039.

This case raises an important question about the constitutionality of a practice frequently used in our trial court. Ultimately, I believe my colleagues' decision to uphold a practice that allowed the public to see, but not hear, the jury selection in Mr. Blades's criminal trial runs afoul of the applicable case law on the right to public trial. I also cannot agree that the prosecutor's repeated erroneous statements in closing argument and the unnecessary admission of the mugshots were harmless errors in the circumstances of this case. For these reasons, I respectfully dissent.